*Ex parte* HUNTER, *et al.*

January Term, 1867.

1. The act of the Legislature of West Virginia, passed February 14th, 1866, in relation to the oaths of attorneys at law, is not unconstitutional.

2. A pardon granted to rebels from the Federal Government, restores the parties to the rights and privileges held or derived from it only. Therefore, no attorney can be admitted to practice his profession in the courts of this State, without complying with the terms of the act in relation thereto.

*Andrew Hunter, Samuel Price, W. S. Summers, Samuel Miller* and *Caleb Boggess* applied at the bar of this court, at the July Term, 1866, for admission to practice without being required to take the oath provided by the †act of the Legislature, passed February 14th, 1866.

Some of the applicants produced pardons from the Executive department of the Federal Government.

Judge *R. L. Berkshire* was a member of the court at that

---

*See page 1.

†Be it enacted by the legislature of West Virginia: No attorney at law shall be allowed to practice in any court, or before any justice or board of supervisors of this State after the passage of this act, until he shall take in the court in which he proposes to practice, in addition to the oath now required by law, the following oath: "I, (A. B.) do solemnly swear that I have not since the twentieth day of June, eighteen hundred and sixty-three, borne arms against the United States, nor against the State of West Virginia; that I have voluntarily given no aid or comfort to persons engaged in armed hostility thereto by countenancing, counselling or encouraging them in the same; that I have not sought, accepted nor attempted to exercise the functions of any office whatever, under any authority in hostility to the United States or to the State of West Virginia; that I have not yielded a voluntary support to any pretended government, authority, power or constitution within the United States, hostile or inimical thereto, and that I take this obligation freely, without any mental reservation or purpose of evasion."

time, and in consequence of Judge *Harrison's* illness, Judge *Loomis*, of the VI. circuit, was called to the bench. The matter was elaborately argued by the parties, and by their counsel, at that term, but no decision was had until January Term, 1867, when it was determined by President *Brown* and Judge *Loomis*, Judge *Berkshire's* term having expired.

*Charles J. Faulkner* appeared for the applicants.

Attorney General *Maxwell* and *B. F. Stanton* resisted. Mr. *Stanton* said:

The applicant, *Andrew Hunter*, presents himself to the court and asks the privilege of practicing at this bar, without taking the oaths prescribed by the law of February, A. D., 1866, which requires all attorneys who propose to practice in the courts of this State, to take an oath that they have done nothing in aid of the late rebellion since the 20th day of June, A. D., 1863.

The facts upon which he bases his application are as follows:

1. That he was duly licensed to practice law in the courts of the State of *Virginia* in the year 1824.

2. That he practiced as an attorney in the courts of *Virginia* from his admission to the commencement of the late rebellion, in the spring of 1861.

3. That in May, 1861, he was elected to the House of Delegates of the State of *Virginia*, and served out his term of two years, during which the State legislature, of which he was a member, disclaimed any allegiance to the Government of the United States, and recognized the supremacy of the Southern Confederacy.

4. At the expiration of his term of service in the House of Delegates, he was elected to the Senate of *Virginia*, and served a term of two years in the Senate, while *Virginia* was a State of the Southern Confederacy.

5. As a member of the Senate and House of Delegates, he took the oath of allegiance to the Southern Confederacy.

6. He does not come within any of the exceptions to the the President's amnesty proclamation of May 29, 1865. He took the amnesty oath prescribed by the amnesty proclamation of President *Lincoln* of December, 1863, and President *Johnson's* proclamation of May, 1865.

7. The State of *West Virginia* was admitted into the Union as a State on the 20th of June, A. D., 1863.

8. The applicant was never admitted to practice in the courts of *West Virginia*, nor in the courts of the restored government of *Virginia*.

Upon this state of facts, Mr. *Hunter* claims the right to practice law in this State without taking the oath required of lawyers in this State to practice in the courts of the State, passed February, 1866.

It is claimed in the first place that by a just construction of this law, it does not apply to lawyers practicing before its passage.

But the whole scope and spirit of the law is so manifestly intended to embrace all lawyers who propose to practice in the State, that the applicant manifestly places but little reliance on this proposition. The law says that "no attorney-at-law shall be allowed to practice in any court, or before any justice or board of supervisors of this State, after the passage of this act, until he shall take in the court in which he proposes to practice, in addition to the oaths now required by law the following oath."

But if this were so, Mr. *Hunter* never was admitted to practice in the courts of *West Virginia*. And I propose hereafter to show that he is not entitled to practice in this State by virtue of his license to practice in the State of *Virginia*.

But the applicant relies mainly upon the proposition that the law of February, 1866, is unconstitutional, because it is *ex post facto*, is in the nature of a bill of attainder, impairs the obligations of a contract, and divests vested rights. To this I reply:

1. That the presumption is always in favor of the constitutionality of any law upon the statute book. It will never

be presumed that the legislative department of the Government has transcended its powers, and passed a law in violation of the constitution which the members of the legislature were sworn to support. If, therefore, upon a full consideration of the whole question, the court is in doubt as to whether the law is in violation of the constitution or not, the decision must be in favor of its constitutionality.

2. But I hope to be able to relieve the court of all reasonable doubts on the subject, and to show beyond cavil and controversy, that the law is clearly and plainly a constitutional and valid enactment.

The case depends upon the nature and character of the rights acquired by an attorney by his admission to the bar, and the power of the legislature and the courts over him in his official character as an attorney.

I deny that an attorney by his license acquires any rights that are not subject to the absolute dominion and control of the legislature, and the courts in which he is authorized to practice.

It is important to any just and accurate conception of the questions involved in this application to understand precisely the relation which an attorney occupies towards the court, the law and the community.

They have been recognized as an essential part of the machinery for the administration of justice, as an indispensable appendage to the courts as far back as we have any traces of the common law.

We find them recognized in the acts of Parliament in England, as far back as the reign of *Henry III.* In the 20th year of the reign of *Henry III.*, they were authorized to appear for persons owing suit or service to the court leet, or the court of the manor.

From that time there are frequent recognitions by act of Parliament, in the shape of laws conferring authority upon them in special cases, prohibiting certain offences, &c., &c.

In the fourth year of *Henry IV*, for the first time, a roll of the attorneys practicing in each court was required to be kept in the courts in which they practiced. From that time

to the present, not only Parliament, but the courts in which they practiced, have exercised the most unlimited control over them.

. The history of the State of *Virginia* is full of instructive precedents on this question. Very soon after the settlement of the colony a struggle commenced between the planters and the lawyers, which continued for more than a century.

During that period numerous laws were passed regulating the mode of admitting lawyers to the bar, prescribing the oaths they should take, regulating their fees, punishing them for misconduct, taking illegal fees, &c., &c., in which the colonial legislature exercised the most unlimited control.

In 1642, a law was passed requiring all attorneys to be licensed, and regulating their fees. 1 Henning Statutes, 275.

In 1645, a law was passed expelling all attorneys from office and prohibiting them from practicing in the courts. 1 Henning Statutes, 305. At the same session a law was passed repealing the law authorizing attorneys to be licensed. 1 Henning, 313.

In 1647, a law was passed prohibiting attorneys from taking any fees or practicing in the courts, and requiring the courts to manage causes for weak parties who could not manage them themselves, or to appoint some person from among the people to manage them for them. 1 Henning, 349.

1656, the law expelling "mercenary attorneys" was repealed, and the Governor and Council were required to appoint attorneys for the quarterly courts, and the commissioners to appoint them for the county courts. 1 Henning, 419.

The next year, 1657, a law was passed prohibiting any person from pleading any cause for gain or profit, under a penalty of 5,000 pounds of tobacco. 1 Henning, 482.

At the same session a law was passed expelling all lawyers in the colony from the bar. The Governor seems to have made strong scruple about signing it, and said something about *magna charta*, and quite a contest ensued be-

tween the House of Burgesses and the Governor, in which the House finally triumphed.

So the matter remained for twenty-three years. In 1680 another law was passed requiring all attorneys to be licensed by the Governor, and fixing the fees; 2 Henning, 489.

Two years afterwards, in 1682, the law of 1680, for the licensing of attorneys was "found inconvenient" and repealed; 2 Henning, 498.

So the law remained for thirty-six years. But somehow the attorneys, with or without law, had got to practicing again; for in 1718 a law was passed fixing the fees of attorneys in the general court and in the county court; 4 Henning, 59.

In 1732 the colonial legislature for the first time passed a law somewhat in detail, providing for the admission of attorneys, defining their duties, regulating their fees, and defining the power of the courts over them, and requiring them to take an oath.

This is the first law which required an oath from attorneys in the State of *Virginia*.

The law remained in force ten years. In May, 1742, a law was passed, the preamble of which recited that the former law had "not been found to answer the good design and intention thereof;" and it was enacted that the law be "repealed and made void." 5 Henning, 171.

So matters stood for three years. In 1745, another general law was passed, providing for licensing attorneys and regulating their duties, fees, &c.

The third section provides that applicants for license shall present to the examiner a certificate of character from the proper county court, upon which he may be examined, and if found qualified, the examiners shall grant him a license. Every person obtaining such license, shall, before he shall be admitted to practice, "take the oaths appointed by law to be taken, instead of the oaths of allegiance and supremacy, and take and subscribe the oath of abjuration and subscribe the test;" and in addition the following oath: "I, A. B., do swear, that I will truly and honestly demean myself in

the practice of an attorney, according to the best of my knowledge and ability." Every person practicing without license to forfeit five pounds in every case in which he appeared.

In 1776, May, a law passed requiring attorneys to take an oath of allegiance to the Commonwealth of *Virginia*; 9 Henning, 221. So the law stood in relation to attorneys until after the close of the war of the revolution.

In 1786, the law regulating the admission and practice of attorneys was again revised, and three judges of the court of chancery or general court were authorized to grant license; and "every counsel, attorney or proctor before he shall practice, shall, in some court of record, give assurance of fidelity to the commonwealth, and if he shall hereafter obtain license shall take the ordinary oath of an attorney." It also authorizes the general court on information filed and on conviction, to suspend or revoke an attorney's license; 12 Henning, 339.

So stood the law until February 15th, 1819, when the law was passed under which the applicant's license was granted. The second section of this law provided "that before an attorney shall be permitted to practice in any court of this Commonwealth, he shall first produce his license in each court where he intends to practice, and in the presence of such court shall give assurance of fidelity to the Commonwealth."

Every person that has been or shall be convicted of felony shall not be licensed. If the judges observe malpractice, or complaint of malpractice is made, an information may be filed, and if the party is found guilty, he shall be suspended or his license revoked.

No attorney who shall prosecute a suit in an inferior court, shall be permitted to prosecute such cause in the appellate court. Fees fixed for services. Sec. 14, 1 Revised code of 1819, p. 267 to 272.

The law now in force in *Virginia*, code of 1860, p. 699, repeals the section fixing the fees, changes the provision in regard to giving assurance of fidelity to the Commonwealth,

and requires an oath of fidelity to the Commonwealth. This review of the legislation of the State of *Virginia* shows beyond all controversy, that the privileges or rights conferred by an attorney's license, have never been regarded as in any sense a franchise that could not be changed or revoked at the pleasure of the law-making power of the State. During the first century of the settlement of the colony the license of attorneys were repeatedly revoked and annulled in the most sweeping and comprehensive terms. Their fees were increased and diminished, the oaths required of them were changed and modified according to the exigencies of the times, or the whim and caprice of the legislature. No question seems ever to have been made as to the power of the legislature to exercise the most absolute dominion and control over them except in a single instance.

When it is considered that the parties prejudiced by these laws, was the whole bar of the colony, and they acquiesced in it for more than a century without resistance or remonstrance, the conclusion is irresistible that the power was universally recognized and admitted.

The oath of abjuration and supremacy was required of all lawyers, as well those previously admitted as those thereafter to be admitted.

The law of 1745 was the first law that required lawyers to take these oaths. It cannot be doubted but there were many lawyers in the colony professing the Catholic religion and believing the Pretender to be the lawful heir to the crown of Great Britain. But under this law he must abandon his practice, or forswear his allegiance to his God and his King.

This law, or others with the same provision, remained in force until 1776, when all lawyers were required to renounce their allegiance to the King of Great Britain, and swear allegiance to the commonwealth of *Virginia*.

So from the settlement of the colony to the present time, the legislature has constantly exercised the power of increasing and diminishing the fees of lawyers and prohibiting them from taking fees in addition to the fees prescribed by law.

In the only instance in which exemption from legislative control was ever claimed, it was promptly denied, and has never since been claimed. So the courts have constantly exercised the power of suspending or revoking the license of attorneys for any cause they may deem sufficient. The only limitation that has ever been placed upon this power is, that an information must be filed and a jury sworn to inquire into the truth of the charges contained in the information. But the court is the sole judge as to what charges shall be sufficient to suspend or revoke the license of an attorney. It is not necessary that he should commit any offence punishable by the laws of the State, that he should be convicted of any crime, but whatever the court may consider "malpractice" or "misconduct" is sufficient to suspend an attorney or revoke his license.

What is the value of a franchise or privilege that is held by such a tenure as this?

The idea that a lawyer's license confers upon him any irrevocable franchise or privilege, is a delusion and a snare, and can only lead to error and that continually.

It is a mere privilege conferred upon him without consid_ eration, and revocable at the pleasure of the power by which it was granted. A municipal corporation is a franchise, but as it is public and gratuitous, no capital invested on the faith of it is revocable at the pleasure of the legislature.

But whatever rights the applicant may have acquired in the State of *Virginia*, they give him no rights in the State of *West Virginia*. It is one of the essential attributes of sovereignty to organize courts, and prescribe the powers and duties of the judges and officers of the courts.

When a new State is created out of the territory of an existing State, all officers and others holding offices or privileges under the laws of the old State, are at once divested of them, unless they are preserved by the constitution and laws of the new State. A judge whose term has just commenced, acquires no rights in the new State, and loses his office unless he removes within the territorial limits of the old State.

His eligibility to office, his right to vote, and all other privileges derived from the laws of the old State are gone, .and may be altered and changed at pleasure by the new State.

If he were a voter in the old State without being a free-holder or a householder, the new State might require him to be one or the other, or both. If negroes were allowed to vote in the old State, they might be prohibited in the new. If a man was eligible to an office in the old State at 21 years of age, he might be excluded in the new State until he was 25 or 30. If he was entitled to admission to the law in the old State at 21 years of age, he might be excluded in the new until he was 25 years of age. If he were admitted in the old State at 21, and the new State was created before he arrived at the age of 25 years, he would be excluded from the bar in the new State until he arrived at the age required by the law of the new State. If he were admitted to the bar of the old State without taking the oath of allegiance or fidelity to clients, he might be required to take these oaths before he would be permitted to practice in the new State.

In short the new State might refuse to recognize the admission in the old State, and require all persons desiring to practice in its courts to be examined as to their capacity and fitness, and to conform to such regulations as might be prescribed by law.

*Mr. Hunter* was never admitted to practice in the courts of *West Virginia,* and he must conform to the laws of *West Virginia* as the only condition upon which he can be permitted to practice in her courts.

It is true that the State of *West Virginia* has adopted the laws of *Virginia,* and declared that they shall remain in force until they are altered or repealed.

Amongst the laws of *Virginia* so adopted was the law providing for the admission of attorneys.

But it derived its vitality and validity from its adoption by the constitution and laws of *West Virginia.* It remained in force until it was altered by the laws of *West Virginia.*

*Mr. Hunter* never appeared in the courts of *West Virginia,*

or claimed to be a member of the bar, until the law of *Virginia* was altered by the law of February, 1866, requiring the oath which he now asks to be excused from taking, was passed.

To give him any claim to a vested right to practice in the courts of *West Virginia* he must have been a practicing lawyer, or had a right to practice in the courts of *West Virginia*. He has never taken the oath of allegiance to the State of *West Virginia*, or the oath of fidelity to clients in any of the courts of *West Virginia*.

He will not now claim that he has a right to practice in the courts without taking these oaths. But at the time he presents himself there is a further oath required by the laws of *West Virginia*.

. His admission and the oath taken by him in 1824 in the State of *Virginia* do not, *per se*, give him a right to practice in the courts of *West Virginia*.

He must take an oath of allegiance to the State of *West Virginia*. Why? Because it is required by the laws of *West Virginia*. If he must take one oath because it is required by the law of *West Virginia*, why not the other? The law is not changed because it is easy and convenient to take one oath and he cannot take the other.

It is just as much an invasion of *Mr. Hunter's* rights as an attorney to require him to take the oath of allegiance to *West Virginia*, as it is to require him to take the oath of February, 1866.

The State of *West Virginia* bears the same relation to the State of *Virginia*, that the State of *Kentucky* does. And I suppose it will hardly be claimed that if a *Virginia* lawyer, who was admitted to practice before the State of *Kentucky* was admitted into the Union, should now go into *Kentucky* and claim the right to practice there without complying with the laws of *Kentucky*. It will hardly be contended that his claims could be recognized.

The reorganized government of *Virginia* passed a law on the 10th of February, 1862, requiring all attorneys to take the oath prescribed by the ordinance of June 11th, 1861;

Laws of 1862, 69, 70. On the 14th of May, 1862, this law was repealed, and an act passed requiring all persons "who shall continue in their office or employment," to take an oath abjuring the State government at *Richmond*, and an oath of allegiance to the restored government of *Virginia*, which was in force when the State of *West Virginia* was admitted into the Union. This law also declares that every person who shall refuse to take that oath, shall be deemed a suspicious person, and may be arrested and required to give bond. This law, which was made a law of *West Virginia* by her constitution, the applicant has never complied with.

Section 8, Article 9, of the constitution of *West Virginia*. provides that "the common law, and the laws of the State of *Virginia* in force within the boundaries of this State, when this Constitution goes into operation, and not repugnant thereto, shall be and continue the law of this State until altered or repealed." The applicant, therefore, was not an attorney authorized to practice law in the State of *Virginia*, according to the laws of that State at the time *West Virginia* was admitted into the Union. He stands, therefore, upon the footing of an attorney from another State taking up his domicil in this State, and asking admission to the bar of this State, as a *West Virginia* lawyer, or of a citizen who had never been admitted, making an original application to practice as an attorney in the courts of the State. The law of February, 1866, is not retrospective as to him, and therefore he can make no question about its being *ex post facto* in violation of contracts or divesting vested rights.

The practice of the Parliament of *Great Britain*, and the colonial and State legislature of *Virginia*, in treating the privileges of an attorney as within their control, is sustained by the decisions of the courts.

In the case referred to by the applicant in 19 Howard, Judge *Taney*, in delivering the opinion of the court says: "And it has been well settled by the rules and practice of common law courts, that it rests exclusively with the court to determine who is qualified to become one of its officers

134  COURT OF APPEALS OF WEST VIRGINIA.

Jan'y Term,  *Ex parte* Hunter *et al.*  1867.

as an attorney and counsellor, and for what cause he ought to be removed."

In that case the attorney was removed by the court in his absence without notice, and without any specifications of the acts of misconduct with which he was charged.

But the court held that the order of removal was a legitimate exercise of judicial power, which the supreme court of the *United States* had no power to control.

But admitting for the sake of the argument, that the applicant was a practicing attorney in the courts of this State at the time the law of February, 1866, was passed, we deny that that law is *ex post facto*, violates contracts, divests vested rights, or that it is a franchise which the legislature had no power to deprive him of.

Kent's Commentaries and the authorities there cited are relied upon by the applicant in support of the proposition that the law is unconstitutional. Chancellor Kent says: "*Ex post facto* laws relate to penal and criminal proceedings which impose punishments of forfeitures, and not civil proceedings which affect private rights retrospectively;" 1 Kent's Com., 408-9.

Certainly the utmost that can be said of this law is, that it affects "private rights retrospectively."

It is, therefore, not an *ex post facto* law according to Kent's definition.

The cases of *Calder* vs. *Bull*, 3 Dallas, and *Fletcher* vs. *Peck*, 6 Cranch, are also referred to in support of the proposition that this is an *ex post facto* law. The case of *Calder* vs. *Bull* was this: The will of *Norman Morrison* was offered for probate before the probate court of *Hartford* county, *Connecticut*, and was rejected on trial. The devisees failed to perfect their appeal from the judgment of the probate court within the time prescribed by law. It was, therefore, claimed by the heirs at law that the judgment of the probate court had become final and irrevocable, and that the title to the property devised by the will had irrevocably vested in them. On the application of the devisees, the legislature of the State of *Connecticut* set aside the judgment

of the probate court and granted a new trial to the devisees, with liberty to appeal from the judgment that might be rendered on the new trial, within six months. On the new trial the will was established and admitted to probate. The contestants appealed, and the supreme court affirmed the judgment of the probate court, in admitting the will to probate. The heirs at law claimed that the law setting aside the first judgment of the probate court and granting a new trial was *ex post facto* and unconstitutional, because it divested them of the title which they acquired by the first judgment of the probate court, which was not appealed from in pursuance of the law then in force. The court held that the law was not unconstitutional or *ex post facto*. And there is not a word in the opinion of the court that gives any color to the claim that a law affecting rights of property, or civil rights is an *ex post facto* law.

The case of *Fletcher* vs. *Peck*, 6 Cranch, was this: The legislature of the State of *Georgia* passed a law authorizing the Governor to sell and convey 500,000 acres of wild land in that State. In pusuance of this law the Governor sold and conveyed 15,000 acres of land to *Fletcher* for 3,000 dollars. A subsequent legislature repealed the law authorizing the Governor to sell the land, and declared the law void because its passage had been procured by bribery and corruption, and revoked all sales and grants made by the Governor under it. The court held that so much of the repealing law as attempted to revoke grants made by the Governor before its passage, was unconstitutional—not because it was *ex post facto*—but because it was a law impairing the obligation of contracts.

In other words, the court would not permit the State of *Georgia* to stultify herself by repudiating her own contracts.

But what contract did the legislature of *West Virginia* make with *Mr. Hunter* that she seeks to repudiate by the law of February, 1867?

I am not able to see the analogy between that case and the case at bar.

The case of *Dartmouth College* vs. *Woodward*—4 Wheaton,

referred to by the applicant—simply decides that the legislature of a State cannot repeal the charter of a private corporation upon the faith of which capital has been invested, and thereby for all practical purposes, confiscate the capital so invested. It has ever since been recognized as a leading case, and is undoubtedly sound law, though it has recently been gravely questioned. In the cases which came up from *Ohio* under the State constitution of 1850, and the laws passed in pursuance of it, increasing the tax on banks previously chartered, the authority of that case was called in question, and denied by a minority of the supreme court of the *United States*. In the case of *Dodge* vs. *Wooley*, 18 Howard, 361, involving this question, Judges *Catron*, *Daniel* and *Campbell* dissented. In the case of the *State Bank of Ohio* vs. *Throop*, 16 Howard, 393, the same judges dissented. In the case of *Butler* vs. *Pennsylvania*, 10 Howard, 402, it was held that a law reducing the salary of an officer from four dollars to three dollars per day, and changing the mode of appointment so as to oust an incumbent before the expiration of his term, was not a violation of contracts, but was a valid, constitutional law.

In the case of *Satterlee* vs. *Matthewson*, 2 Peters, 380, it was held that: " Retrospective laws which do not impair the obligation of a contract, or partake of the character of *ex post facto* laws are not forbidden by the Constitution of the *United States*."

In delivering the opinion of the court, Justice *Washington* said: "The objection, however, which is most pressed upon the court is, that the effect of this act was to divest vested rights. There is certainly no part of the Constitution of the *United States* which applies to a State law of this description, nor are we aware of any decision of this, or of any circuit court which has condemned such a law upon this ground, provided its effect be not to impair the obligation of a contract."

In 1829, the legislature of *Virginia* passed a law authorizing a turnpike corporation to raise money by lottery to repair its road. In 1834, a law was passed limiting the ope-

ration of the act to six years.    Held, that this limitation did not impair the obligation of a contract.    *Phalen* vs. *Virginia*, 8 Howard, 163.

In the case of the *Charles River Bridge* vs. *Warren Bridge*, 11 Peters, 420, the first point decided in the case is that: "A State law may be retrospective 'and divest vested rights, and yet not violate the Constitution of the *United States.*"

Chief Justice *Taney* in delivering the opinion of the court says: "It is well settled by the decisions of this court that a State law may be retrospective in its character, and may divest vested rights, and yet not violate the Constitution of the *United States*, unless it also impairs the obligation of a contract."

*Attorney General Maxwell*, in substance, said:

All courts with common law power to admit attorneys to practice in their respective courts, have always had the common law power to exclude attorneys, after they have been admitted, for conduct deemed by the courts immoral, of which they are the exclusive judges; 4 H. IV, ch. 18 English Statutes at large, vol. 1, p. 543; 6 East, 142; 1 Yerger's Rep., 229, 238; 2 Cowper's Rep., 455; 3 Paige, 510; 5 Rawle, 204; 22 Cal. Rep., 320; 1 Howard, Miss. Rep., 303; 19 Howard, 9; 4 Wheat, 531.

The common law courts do not exclude an attorney as a punishment to the attorney for his moral delinquency, but as a measure of protection to the public; 5 Rawle, 204; 3 Paige, 510; 22 Cal. Rep., 320.

The commission of, or the attempt to commit any treason, or other felony, has always been held sufficient cause for the removal of an attorney in the common law courts, whether the offender has been convicted or not, although pardoned or punished; 6 East, 142; 1 Yerger's Rep., 229, 238; 7 Cowper's Rep., 445; 4 H. IV., ch. 18 Eng. Statutes at large, 543; 22 Cal. Rep., 320; 24 Cal. Rep., 241.

The courts exercise this jurisdiction, or may do so in a summary way, by putting the accusation in the form of interrogatories, and require the supposed offender to answer

under oath, and unless he denies the charge, strike his name from the list of attorneys, without the intervention of a jury; 1 Tidd's Prac., 81; 4 Blackstone, 233; 1 Zebriskie's Rep., 344.

Under the law of this State the admission and exclusion of attorneys is controlled by the legislature, and not by the courts as at common law; 1st Henning's Statutes at Large, 275, 302, 313, 330, 349, 419; 2d, 478, 498; Code of Va., 1860, 699; Ordinance June 19, 1861, and Act of General Assembly Feb. 10, 1862; Act of Oct. 19, 1863, p. 67.

The right of the legislature to regulate or exclude attorneys was never before questioned but once, and in that instance the right was finally conceded; 1 Hen. Stat. at Large, 495.

An attorney admitted to practice under a statute ought to be excluded by a statute, for the same reasons that a common law court that admited him may exclude him, and in the same summary manner; 22 Cal. Rep., 322.

The proceedings to exclude or disqualify an attorney under a statute must be in conformity to the statute. The error in *Fisher's* case, 6 Leigh, 619, was that the statute had not been pursued in the court below. The legislature has by the act of February, 1866, put in the shape of an oath causes sufficient to justify any common law court to remove any attorney, and requires all attorneys to take the oath before they shall be allowed to practice, after the passage of the act. The proceeding is no harsher than the proceeding by rule in the common law courts.

But it is contended here in argument that the legislature has no power to pass the act of February, 1866.

The power of the legislature is only restrained by the Constitution and laws of the *United States*, or the Constitution of this State; 1 West Va. Rep., Stratton's case, 305; 22 Cal. Rep., 308.

The right to practice law is not a natural or inherent right, but a mere privilege created by statute, which may be taken away by statute for a forfeiture of the condition on which it is granted, that is of continuing good moral char-

acter; 22 Cal. Rep., 319; 6 Wendell, 531; 24 Cal. Rep., 241; 1 Yerger, 238.

The right to practice law is not a grant or contract, as it is claimed, which cannot be impaired by the legislature; 10 Howard, 402; 7 Porter, 286; 10 Mo., 593; 12 Mo., 271; 22 Cal. Rep., 319; 24 Cal. Rep., 241.

The act is neither *ex post facto* nor penal; it violates no contracts, and contains nothing but what is a good common law cause for removing an attorney; 2 Peters, 380; 11 Peters, 420; 3 Stewart, 387; 3 Peters, 280; 3 Dallas, 390; 1 Blackstone, 46.

The pardon claimed amounts to nothing. The President of the *United States* "shall have power to grant reprieves and pardons for offences against the *United States*," but this must be construed to mean for offences against the laws of the *United States*. But if such is not the case, the pardon does not restore to the relation forfeited; 2 Leigh, 724; 2 Cowper, 445; 22 Cal. Rep., 322–3; 24 Cal. Rep., 241.

BROWN, President.

This is an application by the above named gentlemen to be admitted to practice as counsellors and attorneys at law in this court, upon taking the oath to support the constitution of the United States and of this State; but, without taking the oath prescribed by the act of February 14th, 1866, entitled "An act in relation to the oaths of attorneys at law."

All of them had been regularly licensed and practicing lawyers in the State of Virginia antecedent to and at the breaking out of the rebellion, and all resident, then and now, within the territory embraced in the State of West Virginia. All had adhered to and taken part in the rebellion from the beginning, and continued till after Lee's surrender, when they respectively surrendered themselves as prisoners to the military forces of the United States on the same terms extended by General Grant to the forces under the rebel chief. All have received the Executive clemency, and all accepted the Executive pardon, upon the terms prescribed in the amnesty

proclamation of President Johnson. And it is now claimed in support of their application—that the act of February 14th, 1866, is unconstitutional and void. Also, That the terms of surrender and the President's pardon restored them to whatever rights and privileges they may have forfeited in the premises, and therefore, they are entitled to be admitted to the bar, and enrolled among the attorneys of this court upon the terms proposed.

In entering upon the consideration of this case, it is necessary to group together the facts and circumstances connected with, and which induced the act, which the court is asked to invalidate.

A civil war existed between the government of the United States and a portion of her citizens. The war was prosecuted on the part of the government to suppress the rebellion and restore the Union, and on the part of the rebels to disrupt the Union and establish an independent government over part of the States of the Union. The State of West Virginia, in common with the other loyal States, lent her aid in the general effort, but in addition thereto she was from the day of her foundation engaged in a war of self-defence on her own responsibility, against her enemies, who invaded her territory and sought by military force her overthrow and extinction.

To this end, in addition to near thirty thousand troops furnished to the National government, she raised and equipped numerous independent forces of State troops on her own account, and for her own defence, officered and paid by the State, and acting under the command of the State authorities. These are matters of such public notoriety and general concernment, as require the court to take judicial notice of them, so far as they have connection with, or bearing upon the statute under review.

By the Constitution of the United States, Art. 1, sec. 3, it is provided that a State may keep troops and engage in war when invaded, or when in such imminent danger as not to admit of delay.

There can be no doubt, therefore, of the existence and

legality of the war, on the part of the State, against her enemies who sought by military force to subjugate her people, overthrow her government and annihilate her existence.

Pending this state of war the act in question was passed, not for the purpose of punishing the guilty parties, but to guard the State against the supposed danger likely, or at least possible, to arise from admitting enemies, or those who but recently had been so, to hold places of public confidence and influence both towards the people and the courts.

It may not have been the best policy in the legislature to attempt such means of safeguard as that adopted; but it cannot be denied that the object was within the legislative power, and the means within the legislative discretion.

It was, therefore, a war measure, rather than a peace offering, a precautionary measure to guard against prospective danger made a matter of some interest and solicitude by recent experiences.

It cannot be denied that the confidential and peculiar relations of the legal profession to the courts and people, their talents, learning and influence make them potent for good or evil, as they may be loyal or disloyal, in sustaining or subverting the government under which they exercise their great privileges.   And if the history of the times were entirely silent on the subject, the act in question shows how the legislature regarded the sympathies and conduct of not a few of the profession in a most trying and critical period. And the legislature would doubtless answer, if questioned for the act, that those who had once done the things, which endangered the public safety, would not likely be very averse to attempt it again, if opportunity offered.   It is the argument by which the common mind is satisfied that the sun will rise on the morrow, and is an application of the rule of judging the future by the past.   But whether wisely or unwisely applied is a matter not for review by the court.   It is at least sufficiently plausible, when taken in connection with the temper and spirit of the times, to save the legislature from the charge of wanton persecution.

It was contended that the war ended with the surrender

of the rebel chiefs, Messrs. Lee and Johnson, and the terms of the surrender were read to show the right of the vanquished to return home and pursue their usual avocations.

But that surrender was only to irresistible force, and not a voluntary, or even an involuntary, submission to the laws of the land—nor an admission even of any obligation so to submit; but, on the contrary, it contained an express assertion of the rights of war, and the right reserved to be exchanged as prisoners of war. The belligerent rights secured under that cartel lasted while the parties maintained the attitude of enemies in actual war—though prisoners on parole—but ceased when the prisoner grounded his opposition, as well as his arms, and submitted himself to his lawful, but offended government, and availed himself of the Executive clemency.

No benefit can be claimed here by the applicants, or either of them, from that cartel, after having availed themselves of the Executive pardon. As paroled prisoners they could not have any civil rights under the laws, nor be entertained in the courts of the other belligerent. For it would not be less repugnant to the laws of nature and of nations than to the common law, to permit public enemies to avail themselves of the use of the courts they were fighting to destroy, or act as officers and advisors of such courts, in expounding the laws which the expounders set at defiance.

War does not of itself, necessarily, forfeit the enemies' property and rights, so as *proprio vigore* to divest them, but it gives to the sovereign power the right to declare the forfeiture and make it effective by positive law; or, in the language of Chief Justice Marshall, in delivering the opinion of the court in the case of *Armitz Brown* vs. *The United States*, 8 Cranch, 110, "It may be considered as the opinion of all who have written on the *jus belli*, that war gives the right to confiscate, but does not of itself confiscate the property of the enemy."

Nevertheless, without such positive declaration, the rights remain suspended until the war ends, and then what the war leaves may be resumed and enjoyed as before.

Now, it has been contended for the applicants, that the act in question forfeits, and in effect deprives them of their privileges as attorneys, and thus adds another punishment to that prescribed by the laws existing at the times of the acts done; and therefore, is repugnant to the constitution and void.

But admitting it to be true, as alleged, that the act does thus forfeit the privileges of attorneys, who were enemies engaged in rebellion, is it not then the exercise of a sovereign right, which war gives to every belligerent, to confiscate the property and forfeit the privileges of the enemy? Or, as we have seen the rights and privileges of attorneys in the courts of the other belligerent suspended by the war, if the effect of the act in question should only be to continue that suspension, without attempting to abrogate the privilege altogether, would it not equally fall within the belligerent right, so plainly stated by Judge Marshall as the opinion of all who have written on the *jus belli*, and approved by the Supreme Court of the United States, in the case referred to?

And while the President's pardon might restore the party to all the rights and privileges which he held or derived under the government which conferred the pardon, it would hardly, I imagine, be seriously contended that the effect of such a pardon could be extended further; but would leave the party to make his peace with his offended State as best he could; and in no event could such a pardon restore him to forfeited privileges which had been originally conferred by, or derived from the State Government, and which, if enjoyed or exercised at all, must be done under the State laws.

The office of attorney-at-law is one peculiar to itself, and concerns the public weal no less than the private benefit of the attorney and his client.

The attorney is an officer of the court, whose aid is essential to the proper administration of justice. As such officer, he holds intimate and confidential relations to both court and client, and occupies a position of dignity and honor, not

less in the eye of the law than in the eyes of the people; a position, too, of more than ordinary influence; and in addition to all these, he possesses privileges and immunities of more than money value, which concern as well the public as himself.   All these privileges and immunities are conferred by the law for the public good, and are, therefore, held and enjoyed in subordination to the public control.

The license, of itself, and before admission or induction by the court, does not constitute the holder an attorney or officer of any court, but simply entitles him to be admitted as such, to practice in all the courts of the State, upon his taking the oaths required by the laws in force at the time of such admission, unless good cause appear to the court for withholding its permission.   And any cause that would warrant the suspension or expulsion of an attorney from office, or, as it is commonly called, striking his name from the roll of attorneys, would equally authorize a refusal of admission.   Otherwise, the court would be required to enact the folly of going through the forms of admission, only to be followed immediately by a judgment of *amotion*.   In other words, to do, in order to undo.   But the law requires neither courts nor individuals to do a vain thing.

It is the duty of the court not to permit any one to practice as an attorney at its bar who is not by law entitled to do so.   (Collins' case, 2 Va. cases, 222.)   It is the right of every citizen to appear in court by attorney, but it is not the right of every citizen to appear in court as an attorney-at-law for another.   (Code 1860, chap. 164, § 4, page 699.) This is a special privilege, conferred on a few only—and the qualifications and fitness most carefully guarded.   It is manifest, therefore, that the admission by the court of an applicant to practice as an attorney at its bar, is a judicial, and not merely a ministerial act, involving not only the examination of the fact, whether the applicant has been duly licensed as an attorney-at-law, (which license is *prima facie* evidence of the honesty and fitness of the applicant, and also of his age and qualifications,) but also, whether the charge be true, if made in proper form, of any act or cause

Jan'y Term,                    *Ex parte* Hunter *et al.*                    1867.

that would alike disbar him *after* admission. It will be observed also, that there is a marked distinction between the power of the court to supersede or annul the attorney's license, as provided in the 5th and 6th sections of chapter 164 of the Code, and the common law power to disbar him from practicing as an officer of the particular court.

In the former case it can only be done for the causes assigned, and in the mode prescribed by the statute, and when so done supercedes or annuls the license altogether, and alike debars from admission, and disbars after admission from all the courts of the State. (Fisher's case, 6 Leigh p. 619.) But in the latter case, that is, of amotion or suspension from the particular court—the court exercises only the common law powers of a court of record, and its judgment, whether called a judgment of amotion, suspension, expulsion, disbarment, or striking from the roll of attorneys, only affects the official position of the party in that particular court. And he might, notwithstanding such judgment, continue to practice as an attorney in any other court, unless the record were presented there and made the ground of a proceeding for a like object; in which case it would doubtless be deemed sufficient (until reversed,) to warrant a like judgment.

This supervision of the court over its own attorneys, and power of suspension or amotion of them from office, is also a power above and beyond the general power to punish by fine and imprisonment for contempt.

It springs from the propriety and necessity of keeping the temples of justice pure, and the duty of the courts in permitting none to minister there, who are unworthy. For the law will not suffer the temple of justice to be polluted, by making it a house of merchandise, or den of thieves.

On this point Judge Scott, delivering the opinion of the court in Fisher's case, 6 Leigh, 624, said:

"The courts of Westminster Hall have, at all times, exercised the power of punishing their officers, among whom are the attorneys, in a summary way, for misbehavior in office. The punishment is inflicted sometimes by attach-

ment; sometimes by fine; at others by striking their names from the roll of attorneys, by which they are disabled from practicing in the court inflicting that punishment. The power of thus punishing the officers of the court, although a branch of the general power of punishing contempts summarily, yet, greatly transcends the limits of the general power." And the opinion of Fry, justice, in the same case, is to the same point, wherein he says:

"But it is believed, the powers of no court at common law, extend farther than to fine, imprison, or disbar, from its own forum. Contempts, or other misconduct, may be punished by fine, imprisonment or striking from the roll of attorneys. But striking from the roll of one court, did not extend to any other court. An attorney expelled from the common pleas, might still practice in the King's bench, until the latter also excluded him. This it would do, it is true, upon proof of the record of the other court, provided the case for which such court had acted, was an offence which ought to disqualify him."

The foregoing views would seem to conclude the case of the present applicants, for although the sufficiency of their Virginia licenses has been settled by the case of Faulkner, as equivalent to similar licenses granted by this State, yet those licenses only entitle the holders to be admitted as attorneys-at-law upon their taking the oaths *required by the laws in force at the time of admission.* For it is believed, that none of the applicants mentioned, whose applications are all subsequent to the passage of the act prescribing the oath complained of, but admitted the power of the legislature to pass such a law, to operate prospectively on all who had not acquired a vested right in the office, and privilege of an attorney. And though it was claimed that they had such vested right by virtue thereof, which entitled them to admission before the passage of the act in question, yet that pretension cannot be sustained. While the applicants were in rebellion, and public enemies in a pending war, repudiating all obligation and allegiance to the United States and to this State, and while they claimed allegiance and

yielded a voluntary, if not a zealous support, to the rebel governments, that were, but are not, it cannot be pretended that they had any vested rights or franchises under their licenses aforesaid, and the laws of this State, to appear and demand admission as attorneys at the bar of this court. The views expressed in Quarrier's case are opposed to such a pretension; it certainly is as visionary " as the baseless fabric of a dream;" and the more I consider the subject, the more I am surprised that an idea so absurd could have been seriously entertained.   But "whom the Gods destroy, they first make mad."

If, then, the applicants, while enemies, had no such rights or franchises as now claimed, when, and how, did they obtain them since?   By our statute (Code 1860, chap. 164, § 2, page 699,) "any person duly licensed and practicing as counsellor or attorney-at-law, in any State adjoining this, or in the District of Columbia, may practice as such in the courts of this State."   And by the act of February 10, 1862, page 69, "every attorney in the United States might do the same."

These acts entitled all the attorneys in the United States, not resident in this State, to practice in all our courts, upon simply taking the oath to support the constitution of the United States, and the oath of office.   ONLY A FEW availed themselves of the privilege.   Since the passage of those acts others have been passed, modifying the oaths, and some adding new oaths.   Now, have all the attorneys of the United States, who have not chosen to avail themselves of the privileges thus conferred, until the laws conferring the privileges have been changed, a vested right in the privilege aforesaid, and a franchise that cannot be infringed by the grantor, and therefore a right *now*, or at *any time* hereafter, that may suit their caprice, to apply for admission to practice without taking any of the oaths prescribed by subsequent laws?   Can it be possible that legislative control over those who minister in the temples of justice is forever restrained?   For it must be borne in mind, that a license which entitles a party to be admitted as attorney in court, is

not forfeited, if he fail to apply for admission immediately, but runs during good behavior. And it is not perceived on what different ground all the attorneys in the United States, not resident in this State, can be made to stand. They are, by force of the statute, as much entitled to be admitted to practice, whenever they apply for admission in the courts of this State, as any resident applicant is, by virtue of his license, whenever he chooses to apply for admission. The only terms prescribed in each case are the oaths to be taken, as required by law; and the only question is whether the oaths required by law, are those required at the time of the passage of the act extending to the attorneys of other States the right to be admitted to practice here, in the one case, and in the other, the oaths required at the date of the license, which likewise entitled the resident party to be admitted to practice—or whether the oaths required by the laws in force at the time of the application for admission must apply. Most unquestionably the latter.

It would be most unreasonable to give any other construction than that which applies the laws in force at the time of the application, and not alone those which were in force at the time the right to apply for admission was obtained, whether by license or statute.

Any other construction would forestall legislation, and in effect completely tie the hands of the law-makers in an important matter of public concern. It would be giving an effect to laws and licenses never contemplated by either grantors or grantees—an effect which might be detrimental to the public good, and dangerous to the public safety.

The right to be admitted to practice as an attorney-at-law in our courts, whether that right be derived under the statute as in the case of attorneys of other States, or under a license as in the case of resident applicants, is always upon the condition of taking the oaths required by the laws in force at the time of admission, and not at the date of the right conferred. If at the time of admission no oaths were required by law, all former laws prescribing and requiring oaths having been repealed, surely no one would pretend

that it would be competent for the court to require the applicant to take the oaths required by law at the date of the license, notwithstanding its subsequent repeal; and yet such would be the case if subsequent legislation cannot apply.

No proposition is better settled in both Virginias than that an attorney in one court is not an attorney in any other court, until admitted by each. When the courts of West Virginia were first organized, there were, therefore, no attorneys therein. For those, who but the day before, were Virginia attorneys practicing in the Virginia courts, could not be West Virginia attorneys practicing in West Virginia courts, until admitted by the latter courts, to qualify and practice as officers therein; and such was the practice in this and the circuit courts.

It is true, according to the ruling in Faulkner's case (1st W. Va. Reports, 269,) the Virginia license was sufficient to entitle them to such admission, yet the qualification and admission by the court was no less essential then than in any other court, in which the attorney had never been admitted, or inducted. Upon such admission this court required the applicants to take the oath to support the constitution of the United States and of this State, instead of the oath of fidelity to the commonwealth of Virginia, which latter oath was the one required by law at the time the applicants were licensed and qualified in the courts of Virginia; the court regarding the laws of Virginia adopted as the laws of this State where not repugnant to our constitution, so far modified as to require the oath of fidelity to the State of West Virginia, and the form of the oath as prescribed in the constitution, instead of the form prescribed in the Virginia statute.

Now suppose the present applicants had appeared at the inauguration of this court or any time before the collapse of the Confederacy, so called, and applied for admission to practice as attorneys at the bar of this court and had objected to taking the oaths required as above stated—alleging that one of them was a senator of the rebel State government at

Richmond, and another, that he was the Lieutenant Governor in the same government, and another, that he was a member of the rebel Congress, and the other, that he was a soldier of rank in the rebel army, and had each taken an oath of fidelity and allegiance to their said governments, and that therefore they could not take the oath to support the constitution of the United States and the constitution of this State, as required by the court, because, that oath was repugnant to the oaths they had already taken. And suppose that they had then maintained, as they do now that they could not be debarred from the privilege of practicing, for the reason, that it would not be lawful to require that oath of them: 1st, because it revoked an existing franchise, and defeated a vested right and so impaired the obligation of a contract: 2nd, because it was *ex post facto*, in requiring an oath to be taken that was repugnant to the oaths already taken; and thus in effect punished the parties in a different manner and with a different punishment, than was lawful when the act was done, or oath taken.

But could such an objection have been sustained, upon any principal of law or reason? Certainly not. To have done so would have been to place the courts at the mercy of the foe, and given double aid and comfort to the enemy.

It would have been unequal, for such liberality was not reciprocal.

But on the contrary it would rather have been the duty of the court, having the parties in its presence and power, to have had them arrested and committed to await the action of the proper authorities charged with the conduct of the war and the defense of the State.

Suppose the legislature should conclude that it was unwise and impolitic to continue the privilege to the attorneys of other States to practice here, and should repeal the law authorizing it; or at least, as regards those States whose laws do not extend a like privilege to our lawyers. Would any one be bold enough to contend that the repealing act would be void, and no bar to the admission of attorneys from such States who were such before the passage of the repealing act?

So far, therefore, as the present applicants, Messrs. Hunter, Miller, Price, and Summers are concerned, I am led to the conclusion that the act of February 14, '66, is neither *ex post facto*, nor does it impair the obligation of any contract with them or either of them, and is not, therefore, on either of those grounds unconstitutional and void, as respects them who had not been admitted as attorneys of this court before the passage of this act.

But the question remains as to Messrs. Boggess and Lamb, who had been so admitted before the passage of the act.

It is here to be borne in mind that those gentlemen do not stand on one of the grounds urged in behalf of the preceding applicants, viz: That the act is *ex post facto*, as to them, because they aver ability and readiness to take the oath, if required by the court, and therefore, there can be no punishment or deprivation, as alleged by the rest. But they insist that it is not competent for the legislature to prescribe additional oaths or qualifications without their consent, before they can exercise the privileges they had as attorneys of this court before the passage of the act. For the right, as they allege, to add one oath, will equally authorize any number of oaths, of any and every description.

Oaths have been resorted to by civilized governments generally, in all ages, and especially in times of war or public danger, as measures of protection, and as instrumentalities of truth and safety.

It is a religious feature of national polity and is one of the few aspects in which all religions in some measure agree. Nor have any appealed to this instrumentality more freely than the most civilized and christian nations.

But oaths have not been regarded as means of punishment, nor resorted to in general for any such purpose.

It is certainly the duty of the State to guard its courts against the dangerous influence of those inimical to its existence and disloyal to its government. And this duty demands greater vigilance on the part of the government in times of war, or other public danger, when apprehensions of danger, whether real or imaginary, from without or with-

in, are greater than in the ordinary quiet and security of more settled and peaceful times.

The power to require oaths is certainly a legislative power, and as such, it has been freely exercised by the British Parliament from time immemorial, by the colonial and State legislatures of Virginia, and by the legislature of this State.

Nor is the requirement of a certain prescribed oath, in the Constitution, a limitation on the legislative power to prescribe and require other and additional oaths. Stratton's case, 1 W. Va., 305.

And in accordance with this is the opinion of Marshall, C. J., in *McCullough* vs. *Maryland*, 4 Wheat, 316, where in reviewing the powers of the government he says: "The powers vested in Congress may certainly be carried into execution without prescribing an oath of office. The power to exact this security for the faithful performance of duty is not given, nor is it indispensably necessary. The different departments may be established; taxes may be imposed and collected; armies and navies may be raised and maintained; and money may be borrowed without an oath of office. It might be argued with as much plausibility, as other incidental powers have been assailed, that the convention was not unmindful of the subject. The oath which might be exacted—that of fidelity to the Constitution—is prescribed, and no other can be required. Yet he would be charged with insanity who would contend that the legislature might not superadd, to the oath directed by the Constitution, such other oath of office as its wisdom might suggest."

Again, attorneys have been the unquestioned subject of legislative control by the British Parliament from the reign of Henry III. to the present time, and by the colonial legislature of Virginia, almost from the time of its inauguration until the revolution.

This control has at all times been most absolute, and by the colonial government most arbitrary, and often inconsistent, unjust and even oppressive; prescribing their oaths and how they might be licensed, and admitted to practice, and again expelling the whole profession from the bar;

sometimes prescribing their fees, then changing them as suited the caprice of the legislature, and then again prohibiting, under severe penalties, their receiving any fees at all, and in some acts called and treated as a nuisance, and in some as mercenary attorneys. Yet no complaint is heard nor opposition offered to the power of the legislature in the premises except in a single instance, and then the power was reasserted and enforced by the assembly.

Indeed, it is questionable whether any class of men contributed more to assert and maintain the powers and privileges of the colonial legislature than the lawyers.

When the people of Virginia by their delegates and representatives in convention assembled, on the 29th day of June, 1776, for reasons set forth in specific acts of misrule by the King, solemnly and unanimously declared, in advance of the Congress, "the government of this country as formerly exercised under the crown of Great Britain, to be totally dissolved," they ordained and established a constitution and government for the commonwealth, and required all officers and attorneys-at-law to swear to be faithful and true to the commonwealth of Virginia, in lieu of the oaths before required, viz: the oath of allegiance to the King of Great Britain, the oath of supremacy, the oath of abjuration and the test. It might be asked how this ordinance affected attorneys who had taken the former oaths, and still adhered to the king, and could not, therefore, without doing violence to their feelings and consciences take it? But such considerations were not allowed to contravene the general rule adopted for the general weal, and designed to guard against disloyalty and infidelity. That the exigency of the times demanded and the public safety justified the measure, we must conclude from the tenor of the ordinance itself— no less than the history of the times. Thus then it would seem that in England and Virginia, until the ratification of the Constitution of the United States, attorneys-at-law were subject to the absolute control of the legislature as respects license, admission to the bar, and expulsion from it, oaths, fees and no fees, duties, conduct and punishment; and

whether that control affected them prospectively or retrospectively, it was all the same; that control being influenced by considerations of a public nature, and based on the right and duty to subserve the public good, was rarely, if ever, subordinated to the private interests of the attorneys.

Subsequently to the ratification of the National Constitution, the legislature of Virginia required attorneys to take the oath to support that Constitution, and by chapter 38 of the Code of 1860, every attorney-at-law was prohibited to practice without obtaining a license annually to do so, under penalty of a fine not less than twenty dollars nor more than 500 dollars; nor could he get such license without first taking the oath therein prescribed, not to pay out bank notes of a less denomination than five dollars.

And again, when the loyal people of Virginia, by their delegates assembled in convention in June, 1861, to consider and secure their safety and liberty, and to that end reorgonized their State government, they required all officers to take a prescribed oath of fidelity to the reorgnized government; and the legislature soon after, in 1862, required the same oath to be taken by attorneys.

And however seriously that ordinance and act might affect those who, having embarked in rebellion, or adhered to its cause, or sworn allegiance to its government, yet the necessity and propriety of such a course can no more be questioned than can that pursued by the convention of 1776 in the ordinance of that date.   Both were precautionary measures, and salutary means to guard against danger and insure the public safety.   They had no other object, and surely it was never contemplated by either body that their respective ordinances were criminal laws, creating crimes, or affixing punishments.   So, too, the anti-duelling act, which required the party to swear, not only that he would not fight a duel, &c., but that he had not done so since an antecedent date.

This act was assailed as unconstitutional, and therefore void, but its validity was sustained by the court of Appeals of Virginia, in Leigh's case, 1 Munford, notwithstanding it was declared by the judges to be penal in its nature.

It will be borne in mind too, that the oaths required by the ordinance of 1776—by the ordinance of 1861, and by the act of 1862, and that required by the act of February 14th, 1866, all alike had their origin in the exigencies and excitements incident to a state of war—for the proclamation of President Johnson declaring the suppression of the rebellion in all the insurrectionary districts, except Texas, was not issued till April 2nd, 1866, nearly three months after the passage of the act in question, and the President's final proclamation declaring the war ended, and peace restored, and the laws executed by the civil authorities, did not issue till August, 1866.

They were all in some sense war measures, and exhibit on their face the influence of the times.

The legislation of these war times also shows the passage of criminal laws, creating, defining, and punishing crimes and misdemeanors growing out of the state and condition of the country, and especially connected with the rebellion. From all of which it is manifest that when the legislature intended to pass criminal laws on the subject, they did not hesitate to do it in the plainest and most direct manner— which tends to confirm, what is patent on the face of the legislation relative to oaths, that it was not intended to operate criminalter, either by creating or punishing offences, but to guard the courts and officers against the supposed dangerous evil influences of disloyalty and infidelity in the officers and advisers. And if any other object can be supposed to have actuated the legislature, it must be deduced from other sources than the context of the acts themselves, and the legal inference of an honest and faithful discharge of duty in the representatives of the people.

The wisdom of the measure I may doubt, but the integrity of it I am not at liberty to question, without good cause.

Not every law which operates prejudicial to an individual, can be said to be criminal, or punitive, and if retrospective, therefore "*ex post facto.*" For then every tax law would be punitive, for they would, in that sense, punish

the tax payer by the amount extorted.   So the authorizing a toll bridge by the side of an established ferry, which would injure the owner of the ferry, by the amount of tolls withdrawn by the greater facilities of the bridge.

So too, the laws forfeiting real estate, which, without office found or other legal proceeding, forfeit lands by the thousand for non-payment of taxes; and that too, not for taxes only to become delinquent in the future, but for taxes delinquent for years before the passage of the forfeiting act. And these laws have been sustained uniformly by the court of appeals of Virginia, and half the land titles of this State are now held under them.   And the supreme court of the United States, in the case of *Harvey and others* vs. *Tyler and others*, sustained the same laws of Virginia.   Yet no one has ever supposed these laws to be criminal laws, notwithstanding they deprived hundreds of people of all their lands for a default committed by them years and years before the passage of the acts.

So too the provision so general that the exceptions excite surprise, which excludes women and minors and negroes, mulattoes and malays from voting and holding office.   Here was no punishment intended by the exclusion, nor crimes imputed to those excluded.   But the effect was no less a deprivation of most serious consequence.   Under it, we have seen one race enslaved by the other for two hundred years, which could not have been done had both enjoyed alike the elective franchise and eligibility to office.

So too the provision in the constitution of Virginia, which excludes from the legislature preachers and bank officers— a provision not continued in the constitution of this State, though some think it ought to have been.   It has never been supposed that this provision was intended as a punishment, nor to impute unworthiness in either of the classes excluded.   On the contrary, both have always been regarded and esteemed among the most honorable and useful, and one the most sacred.   The exclusion was from motives of public policy solely, however mistaken it may have been; but the effect was no less a deprivation in that case than in the

one under consideration.   If it be denied that the effect is in any wise different in the one case and the other, let a single instance or two suffice.

1st.  In Virginia, where preachers are excluded from the legislature, preachers are not exempted by law from military duty any more than the other learned professions.   In West Virginia, where preachers are not excluded from the legislature, preachers are exempted from military duty in a manner not extended to either of the other learned professions.

2d.  It cannot be denied that the reasons on which these test oaths rest, apply as forcibly to preachers as to lawyers, and in most of the other States adopting this policy it has been applied alike to both callings; but in the legislature of this State, where the preachers were more numerous than the lawyers, the policy is applied only to the brethren of the green bag and not of the white cravat.

Again, the act of February 14, 1866, recites conduct which other laws makes criminal, but it does not; which other laws punish, but it does not, at least in the proper sense of that term—and if at all, it is only as an incidental result, consequent on the exercise of a lawful power, and in the execution of a lawful object.   Neither does it change the evidence by which crime is established, nor does it contemplate the proof of any crime by the evidence it appeals to; but, on the contrary, it contemplates a state of innocence and fitness for the confidential relations to be exercised, and adopts a rule at once simple and convenient, and the one generally resorted to in such cases, of making the party a witness, not against himself, but in his own favor, if he chooses to testify at all, which he is at liberty to do, or keep silent, just as he prefers.

For the legislature, after an officer has been appointed and qualified, and entered upon the duties of his office, to diminish the compensation fixed by law at the time of his acceptance, for a part of his term, and even to take away the office itself, before the expiration of the term, and provide for electing a successor, would seem, if possible, a higher stretch of legislative control, and more akin to a

criminal proceeding, and therefore *ex post facto*, than the act of the legislature now complained of; and yet the supreme court of Pennsylvania and the supreme court of the United States have held that such a statute was not unconstitutional; *Butler* vs. *Pennsylvania*, 10 How., 402; and the inference is inevitable therefore that it was not *ex post facto*.

Now the act in question must be either a criminal act, or not a criminal act. If the former, it must be so either in making conduct criminal which was not so prior to the passage of the act, or in augmenting the punishment, or in changing the evidence so as to diminish the proof requisite to establish a conviction.

It has been shown that the conduct referred to in the oath prescribed, can be characterized as criminal only by former laws, and not by this act. But it augments no punishment prescribed by former laws, neither does it change the evidence or authorize conviction upon less proof than was lawful before its passage.

And, as a further illustration of the second point, it may be remarked, that if the execution of the culprit bring death or suffering to his wife or children, the latter consequences however inevitable, cannot be charged to be part of the punishment of the law, for the law does not punish the innocent, neither does it let the guilty escape because of the consequences which may thereby befall others.

So, also, if an attorney had been convicted of felony and suffered the sentence of the law, he could not on a proceeding to disbar him and revoke his license, escape the latter consequence by alleging that such would be to punish him twice for the same offense, which the constitution prohibits. And why? Simply because the latter consequence is no part of the punishment for his crime; nor is the law which authorizes it a criminal law, but a law intended solely to guard the courts against unfit counsellors and advisors— the end, the public safety; the means, the prevention of possible danger.

To withhold or remove a club from the hand of a dangerous man, or who has wielded it to the injury of others, is

no punishment, and there are times when not to do so might endanger the public peace.

It may be said that the past cannot, and ought not, to determine the future of a man's conduct, else there could be no hope or room for reform; and that this is very true, yet it is universally admitted to be a just ground of precaution against a ·recurrence of the evil sought to be guarded against.

From the foregoing considerations, I am led to the conclusion that the act in question is in no proper sense a criminal law, either in purpose or effect; and although, in some sort retrospective, yet not on that account repugnant to the Constitution of the United States or of this State, as an *ex post facto* law. For it is too well settled by repeated adjudication of the National and State courts, that the legislative power of the States of this Union is competent to the passage of retrospective laws, provided they be not *ex post facto*—nor impair the obligation of contracts. *Calder* vs. *Bull*, 3 Dallas, 386; *Hart* vs. *Lamphirc*, 3 Pet., 289; *Watson* vs. *Mercer*, 10 Pet., 110; *Baltimore and Susquehanna Railroad Company* vs. *Nesbitt*, 10 How., 395; *Fletcher* vs. *Peck*, 5 Cranch, 138; *Ogden* vs. *Saunders*, 12 Wheat 266; *Satterlee* vs. *Mathewson.*

And the same point was decided after elaborate argument, in which the authorities were generally reviewed, in this court, in the case of *Wyatt* vs. *Morris*, not yet reported.

The only remaining question, therefore, is, whether the act in question impairs the obligation of a contract as claimed by the applicants.

It is claimed that the attorney's license is a privilege, franchise, office, or immunity of value, and like any other incorporeal hereditament, constituting property in the possessor; that it is acquired by the license, which is claimed to be a contract between the State and the attorney, and resting on consideration deemed valuable in law, moving from the grantee to the grantor of the license, and consists in the "honest demeanor" and legal attainments of the party licensed.

The office of an attorney-at-law is not for life, as has been

claimed, but *dum bene se gesserit*, during good behavior, and not necessarily lost by *non user*. It is public, in that it is created by law for the public good, and as an essential aid to the administration of public justice; and is private, in respect to the particular relations which exist between the attorney and his client.

It is with the public feature of this office, which, in Faulkner's case, was said to be *sui generis*, that we have now to do.

And here, must be borne in mind, the distinction which marks the boundary broad and deep, between the legislative powers inherent in the people of the States, or their authorized agents, the legislature, to do and undo as they deem the public good requires, and the acts which have been and may be denominated and characterized as contracts. The former can be reached only through the elective franchise, and altered or repealed by changing the legislators that enacted them; but the latter are controlled and restrained by the constitutional provision, which avoids any act that impairs the obligation of a contract. In the case of *Crenshaw* vs. *Slate River Co.*, 6 Rand., 273, Judge Green said: "A very liberal construction has been given to the clause of the Constitution of the United States, which prohibits any State to pass any law impairing the obligation of contracts. It has, however never been extended to private rights acquired under the operation of the general laws of the State, and without any consideration given, beyond the general purposes of promoting individual interests directly, and the interests of the community incidentally. Nor do I think it can be justly extended to the protection of rights so acquired. The legislature of the State is declared to be a complete legislature, and consequently has all the powers of sovereignty, except so far as they are limited by the Constitution of Virginia and of the United States."

The same is equally true of West Virginia. Her Constitution vests in the legislature all the legislative power of the State, and consequently all the powers of sovereignty, except so far as limited by the State and Federal Constitutions.

The general rule is, that an act of the legislature is *prima facie* valid until it shall be clearly shown to be void. And in questioning the power of the legislature to pass any given law, it must be remembered that the Constitution vests the entire legislative power of the State in the legislature; that the legislative power of this State is as sovereign, ample and complete as any other, or even as the British Parliament, except so far as it is limited and restrained in its operation by the State and Federal Constitutions.

In considering the powers of the Federal and State governments, it must not be forgotten that they are of very different natures—the one delegated; the other original. The one possessing no power not delegated; the other having all power not prohibited by the Constitution. Stratton's case, 1 W. Va. And the same view is fully sustained by numerous decisions by the Federal and State courts.

In relation to the liberal construction stated by Judge Green to have been given heretofore to the clause in question of the Federal Constitution, it is proper to remark that the tendency of the judicial mind has since been rather to narrow the rule of construction limiting the legislative powers of the States.

And the Supreme Court of the United States, Judge Daniel delivering the opinion, in the case of *Butler* vs. *Pennsylvania*, said: "In order to determine with accuracy whether this case is within the just scope of the constitutional provision which has thus been invoked, it is proper to carefully consider the character and relative positions of the parties, and nature and objects of the transaction, which it is sought to draw within the influence of that provision. The high conservative power of the Federal government here appealed to is one necessarily involving inquiries of the most delicate character. The States of this Union, consistently with their original sovereign capacity, could recognize no power to control either their rights or obligations, beyond their own sense of duty, or the dictates of natural or national law. When, therefore, they have delegated to a common arbiter amongst them, the power to question or

control their own acts, or their own discretion to conceded instances, such instances should fall within the fair and unequivocal limits of the concession made. Accordingly, it has been repeatedly said by this court, that to pronounce a law of one of the sovereign States of this Union to be a violation of the Constitution, is a solemn function, demanding the gravest and most deliberate consideration; and that a law of one of the States should never be so denominated, if it can upon any other principle be correctly explained. Indeed, it would seem that if there could be any course of proceeding more than all others calculated to excite dissatisfaction, to awaken a natural jealousy on the part of the States, and to estrange them from the Federal government, it would be the practice, for slight and insufficient causes, of calling on the States to justify, before tribunals in some sense foreign to themselves, their acts of general legislation.

"And the extreme of such an abuse would appear to exist in the arraignment and control over officers and subordinates in the regulation of their internal and exclusive polity ; and over the modes and extent in which that polity should be varied to meet the exigencies of their peculiar condition. Such an abuse would prevent all action in the State governments, or refer modes and details of their action to the tribunals and authorities of the Federal government. These, surely, could never have been the legitimate purposes of the Federal Constitution. The contracts designed to be protected by the tenth section of the first article of that instrument are contracts by which *perfect rights, certain, definite, fixed private rights* of property are vested.

"These are clearly distinguishable from measures or engagements by the body politic or State governments for the benefit of all, and from the necessity of the case, and according to universal understanding, to be varied or discontinued as the public good shall require. The selection of officers, who are nothing more than agents for the effectuating of such public purposes, is a matter of public convenience or necessity, and so, too, are the periods for the ap-

pointment of such agents; but neither the one nor the other of these arrangements can constitute any obligation to continue such agents, or to re-appoint them after the measures which brought them into being shall have been found useless, or shall have been abrogated as even detrimental to the well-being of the public.

\*      \*      \*      \*      \*      \*      \*

"It follows, then, upon principle, that in every perfect or competent government, there must exist a general power to enact and to repeal laws; and to create and change or discontinue the agents designated for the execution of those laws. Such a power is indispensable for the preservation of the body politic, and for the safety of the individuals of the community."

The office of an attorney-at-law is no less the creature of the statute than the office of canal commissioner—and the one no less than the other was created for the public good, and not for any private benefit to the officer. The one was intended to manage the public works of internal improvement; the other to aid in the administration of public justice. And I must confess I am unable to perceive (to use the language of Judge Daniel,) what perfect rights, certain, definite, fixed, private rights of property are vested in the one case any more than in the other. And yet the Supreme Court of the United States, in the case just cited, says: "We have already shown that the appointment to, and the tenure of, an office created for the public use, and the regulation of the salary affixed to such an office, do not fall within the meaning of the section of the constitution relied on by the plaintiffs in error; do not come within the import of the term contracts, or, in other words, the vested private personal rights thereby intended to be protected. They are functions appropriate to that class of powers and obligations by which governments are enabled, and are called on, to foster and promote the general good. Functions, therefore, which governments cannot be presumed to have surrendered, if, indeed, they can under any circumstances be justified in surrendering them." And precisely upon the same princi-

ple the supreme court of California held, in two cases, that attorneys, by virtue of their licenses or offices, had no such contract within the meaning of the constitution, the obligation of which the State was prohibited from impairing, by the act and oath very similar to the one here complained of. And this California decision is the more entitled to respect, because, from their great distance from the seat of the war, both the legislation and adjudication may be supposed to be less influenced by the excitements incident to proximity to the disturbance, and the attendant dangers in times of civil war; and also from the fact, that the same question was there twice considered and decided in the same way, by a court composed entirely of different judges each time. The case of *Anderson* vs. the *Election Officers* of Montgomery county, recently decided by the court of appeals of Maryland, rests on the same principle.

If the office of attorney is one of value to the possessor, so also was the office of canal commissioner. If one has a legal vested right to exercise the functions and perform the duties of the office, if any client would employ him to do so, the other had the same right, without waiting for such contingency. The laws and the license in pursuance thereof, could confer no more perfect right to the office of attorney than the laws and election in pursuance thereof conferred on the canal commissioner. And the character and acquirements requisite for an attorney to obtain a license, can no more be said to be a consideration moving from the attorney to the State, than the character and acquirements requisite to fill the office and discharge the duties of canal commissioner, or of any other public office, could be said to be a valuable consideration moving from the officer to the State.

Again: Our laws alike authorize attorneys from all the States and territories of the United States to practice here. Now, what consideration can be said to move from them to the State for this privilege, extended no less in this case than in the other, solely for the public good? It will scarcely be pretended that one class of attorneys would be protected by the constitutional provision in question and the others not.

From the foregoing considerations, I am brought to the conclusion that the office of attorney-at-law in this State, whether he be licensed here or elsewhere, constitutes no such contract as contemplated by the provisions of the constitution, both State and Federal, which prohibits the State from impairing the obligation of contracts; and, therefore, that the act of February 14th, 1866, entitled "An act in relation to oaths of attorneys-at-law," is not repugnant to the constitutions, or either of them, on either of the grounds alleged as restraints upon the legislative powers of the State; and which powers, it has been shown, have been exercised in the matter of oaths and attorneys from the earliest periods.

It has been said in the argument that the supreme court of the United States has decided this question, and arrived at a conclusion different from that to which I have come, in a case long pending before that court, and such is the newspaper report; but I have not had the benefit of the opinions of the court, nor am I able to perceive, in advance, how they arrived at such conclusion.   While I entertain for that court a high respect, and in all cases where its decision shall be obligatory on this court, I shall bow to its mandate and wait for the wisdom and good sense of the people to correct the error, if I think it wrong; yet, where not so obligatory, I shall exercise the judicial powers vested in me by the people of West Virginia, and pronounce the law as I understand it to be.

Since writing the above, I have read the opinion of the supreme court, just published in the newspapers, in the case referred to, and also the opinion of the dissenting judges, and after a reconsideration of the subject, I have been unable to arrive at any other conclusion than as above expressed.

But there is a point stated in the argument which may require further consideration, when it shall arise.   It does not, however, properly arise in this case.   It is, whether or not the engagement of the attorney with his client, in a particular case, may not be a contract within the meaning of the Constitution, the obligation of which may not be

impaired, and thus the right of the attorney or client, to finish the case already begun, be preserved *quoad* that case. And some of the authorities seem to warrant that view of the case. But even here I am not prepared to say how far these private contracts are to be taken with reference to the legislative power and control over attorneys for the general good, and, therefore, to be considered as contemplating such contract. For if an attorney, after being employed by a client, should be convicted of treason or felony, and for that cause be disbarred and his license revoked, could he or his client be heard to object, and insist on the right to be heard in the case till it should be finally disposed of? which might be sooner or later, according to circumstances. Upon this point, therefore, I shall express no opinion or conclusion, since the question, though alleged in the argument, does not properly arise in the case, since neither of the applicants show such a case.

For the reasons assigned, I am constrained to hold the act of February 14th, 1866, a valid and binding law so long as it remains on the statute book, obligatory no less upon the court than upon the attorneys who come within its provisions, and as such, should be enforced and obeyed.

The motion of the applicants is, therefore, overruled.

LOOMIS J. It is admitted by each of the parties to this motion, except Mr. Boggess, that his complicity with the late rebellion renders it impossible for him to take the oath required by the act of the 14th of February, 1866. Mr. Boggess alleges that he can take the oath, but declines to do so upon other grounds. None of the applicants except him has been admitted to practice in any of the courts in this State. They produce evidence of having taken the oath of amnesty, and of having received a pardon from the President of the United States, for all offences against the United States.

In support of the motion, it is claimed that the act is unconstitutional, and thererefore void, because :

1. It is an *ex post facto* law—or a bill of pains and penalties.
2. The alternative proposition is contended for, namely,

that if it be constitutional, it must *so* be construed as to have only a *prospective* operation, and cannot be held to relate to attorneys who were licensed, and who but for this act, would have been qualified to practice in this State, under the laws as they previously existed.

3. If it be construed to have a retrospective operation, it is not only *ex post facto*, but impairs the obligation of contracts, and its effect is to deprive a party of property without due process of law.

4. It violates the principle that innocence is to be presumed until guilt is legally proven.

5. That the pardon of the executive relieves the party from all penalties which might, (but for pardon), have been incurred, and inflicted, for having done the things mentioned in the oath.

The court is then called upon to perform a most grave and delicate duty—namely, to inquire whether the co-ordinate branch of the State government has exceeded its power, so as to require the interference of the court; and this in legislating for the protection of the liberties of the State, and of the welfare of the people against the demoralizing influences of the late rebellion.

No principle is more familiar in the construction of statutes than this :—that every presumption is in favor of their constitutionality; and it is only when all other interpretations fail, and in the last resort that the court will decide against their constitutional validity.

I hold it also to be clear, beyond dispute, that as it is a paramount duty of the legislature to watch the bearings of the rebellion, its theories and sentiments, its influences and tendecies upon the interests of the State, and the welfare of the people, with an earnest vigilance, and to wield legislative powers accordingly ; so it is the duty of courts, and more especially of this court—as that of final judgment—in its sphere to assist the legislature, by a cordial co-operation, guarding against contravention of the fundamental law ; but applying the weight of its character and the vigor of its arm,

to the strict enforcement of all laws, so aiming to conserve our institutions and the common good.

It would be a state of things which the good and wise could not fail to deprecate, if in times of imminent public danger, imposing upon the law-making power, extraordinary responsibilities and pressing upon it extreme demands, its co-ordinate and judicial branch were to be found employed in a system of hypercriticism and false embarrassment, and not in an efficient enforcement of the law in all cases, where not clearly found to be in conflict with the constitution.

It is proper in this connection to remark that the considerations which have been urged upon the court by the several applicants, based upon the anticipated hardships that will, or may, result to them, and to others of the same class, should this act be sustained, are appeals which should have no effect; and upon me personally will have no influence. As appeals intended to awaken the sympathy of judges and swerve them from the faithful discharge of duty, they are out of place.

I am constrained further to say, that however painful to me may be the consciousness of the effect which the act, if sustained, may have upon the private interests of the applicants, and of others in their condition, I am not at liberty, either as a good citizen or as a faithful judge to exclude from consideration the patent fact, that each of the applicants, but one, was an earnest participator in, and an abettor of, the rebellion; that the rebellion was treason in its worst and least mitigated form; that they sinned against the light; not led astray themselves, but leading others astray, that deliberately and with a full estimate of chances, they staked their private interests upon the result; that their aim was the destruction of the Union, involving, of necessity the destruction of each of its parts; that they invited and accepted the risks which they voluntarily incurred; and it does not lie in their mouths to deprecate a law which their misdeeds have, in the judgment of the legislature necessitated. Nor am I at liberty to exclude from view the other fact that the State

and the loyal people have *their* rights involved in the matter ; and that a law passed for their protection against a great and threatening evil, creates presumptions in its favor.

Speaking for myself as an individual member of the court, I regard it as my duty to notice the criticisms which several of the applicants have quite freely bestowed upon the spirit of the statute—the animus of the legislature in passing it,— and upon several of the members who took part in the debate.   I am unable to see in the statute, in that body, or in any of the members concerned in the debate, either the spirit of presumption, malignity or the indications of bad faith, which have been attached to them.

In this respect the applicants seem to forget that they were heard upon this application by the grace of the court, and that if their aspersions were allowed to pass without rebuke their impropriety was none the less felt.   The court must be supposed to be alive to a proper sense of self-respect, and to that surrounding respect which is essential to its dignity and usefulness.   Its ear is not open to be used for uncalled for criticisms upon the motives of the legislature, or the conduct of its members ; especially in view of the fact that they emanated from those who stood indictable for high treason against the State, and were enabled to appear here through mere executive forbearance.

In determining the validity of a statute, it is not for the judiciary to inquire whether the act in question is wise or unwise ; nor whether there was a necessity for the statute at the time of its passage.   These are considerations resting solely with the legislature, whose power in such cases is limited only by the Constitution.   It is by this instrument alone that their acts are to be tested, and it would be subversive of all just principles, if courts were to erect any other standard.

Even if it were conceded that the act in question is manifestly tyrannical and oppressive, yet if it is not repugnant to the organic law, it then falls within the pale of rightful legislative action, and the judiciary is solemnly bound to declare its validity.   So on the other hand, however salutary

the law, however great the apparent necessity for it, courts must pronounce it nugatory if it be found irreconcilable with either State or Federal Constitution. In the interpretation of this statute it may be proper to enquire, what were the existing, or apprehended evils sought by the law-makers to be remedied? When these are ascertained it will be easier to determine whether, in providing the remedy, the legislature has transcended its constitutional authority.

In arriving at the intent of the legislature, the scope and true meaning of this law; much aid will be afforded by a knowledge of the events, shortly preceding, and of the facts existing at the time the act was passed. It is a well known fact that, throughout the late disaffected States, as well as in Virginia, that facilities for a general diffusion of knowledge were limited and imperfect; so that the masses of the people were greatly dependent upon the educated few for information touching questions of State interest and public policy. The character of social organization was such that the bar throughout the South gave tone to public sentiments, and complexion to political theories.

Lawyers as a class stood deservedly high in popular confidence. The license of each to practice his profession was a credential of honor, loyalty, and integrity emanating from a source ever held in veneration. Upon all questions of private and public concern, their opinions commanded the highest respect, and stamped their impress on every important enterprise. Hence they were the manufacturers of public opinion and constituted within themselves an element, powerful for good or evil. Their relations to society, coupled with professional privileges, of necessity, gave them vast influence in addition to the advantages which learning, eloquence, and mental discipline may ever successfully wield over an opponent destitute of these qualifications. Who can but lament that so great a number of them forgot their sacred obligations in the time of the country's greatest need, and gave countenance to her destroyers; that the light of their learning, their social position, their strong hold on public confidence, were but agencies employed with fatal effect in alien-

ating the hearts of the people from their country and its constitution? Diligently did they sow the seeds of dissension, and nourish the spirit of disloyalty and discontent. In communities where men of plain understanding had misgivings as to resisting the Government, and were slow to perceive the alleged wrongs that Government had inflicted,—these men were but too successful in stifling their honest convictions by their sophistries, and in subtilly instilling the poison of rebellious sentiments; thus nerving strong arms to violence, and giving a fearful impulse to wicked principles. It was a public boast of the arch conspirators, in counting the probabilities of success " that the *bar* of the South will be unanimous for secession, and their eloquence will move the public mind in its favor."

From our knowledge of events so recent, can it be doubted, that if, at any period, from the beginning to the close of the war, the influence of this class could have been suddenly destroyed, that from that instant the prestige of the rebellion would have vanished? I do not hesitate to say that the rebel ship of State, deprived of this element, would have been as powerless for harm as would the mighty war vessel stripped of her armament, and dismantled.

Here, then, we see a very large majority of a certain class of persons on whom the State had conferred peculiar privileges, availing themselves of these very privileges to destroy the existence of the republic itself. It is a notorious fact, that the overthrow and destruction of the identical courts in which these applicants now desire to practice, were, among other things, contemplated, planned and partially effected by the organization to which they belonged, and with which they co-operated. Fortunately for mankind and the cause of liberty everywhere, the rebellion was crushed and its purposes defeated.

Lawyers from our own State, who went voluntarily away, and for years aided this unholy conspiracy, returned to their homes, and, as of right, claimed their former professional privileges, which they first abused, and then abandoned.

All may foresee the consequences that must follow if this

claim is allowed.   Restored to their former position at the bar, that sense of degradation, inseparable from unsuccessful efforts in crime, would arouse in them every energy to remove from treason the odium it deserves, and to make infamy respectable.

The purity of human laws, the enjoyment of human rights, the perpetuity of civilization itself, depend upon ever keeping prominent and well defined, the great distinctions between right and wrong, virtue and vice; and also upon cultivating in the public mind an abhorrence for all forcible resistance to the laws.   Every effort, then, to break down these distinctions is a public evil; and social safety requires that those for whose interest it is to destroy them should be restrained in their attempts to do so.   Otherwise, patriotism and loyalty cease to be virtues, and hereafter criminals may expect exemption from punishment and disgrace in proportion to the enormity of their crimes.   These and kindred considerations were doubtless what actuated the legislature in the enactment of this statute.   The question now recurs, does this law violate any provisions of the Constitution, either State or Federal?

It is claimed that the law is *penal*, and not *remedial* only, and if construed to operate retrospectively, comes within the definition of an *ex post facto* law, and is consequently void, for repugnance to the 10th section of article 1st of the Federal Constitution.

In the case of *Calder and wife* vs. *Bull*, 3d Dallas, 386, Justice Chase defines what he considers *ex post facto* laws within the constitutional prohibition.

1. Every law that makes an action done before the passage of the law, and which was innocent when done, criminal, and punishes such action.

2. Every law that aggravates a crime, or makes it greater than when committed.

3. Every law that changes the punishment and inflicts a greater punishment than the law annexed to the crime when committed.

4. Every law that alters the legal rules of evidence, and requires less or different testimony than the law required at the time of the commission of the offence, in order to convict the offender. It is further stated in the same decision, that the prohibition (against passing *ex post facto* laws) is an additional bulwark in favor of the *personal security* of the subject—to protect his *person* from punishment by legislative acts having a retrospective operation, and not to secure the citizen in his rights of either property or contracts.

The other prohibitions in the same section, namely, not to "make anything but gold and silver coin a tender in payment of debts," and not to "pass any law impairing the obligations of contracts," were inserted to secure *private rights*.

It is unquestionable then, that retrospective laws affecting *private rights*, merely, are not *ex post facto*, and consequently are not forbidden; while retrospective laws which impair and take away vested rights, may be oppressive, and are sometimes unjust; they may, nevertheless, be strictly constitutional.

(*Thorp* vs. *The Rutland and Burlington Railroad Company*, 27 Vermont Reports, and cases there cited. *Satterlee* vs. *Matthewson*, 2d Peters, 280.)

Unless it can be clearly shown, then, that the intention of the legislature in passing the act of Feb. 14th, was either, *First*, to make some innocent action, done by the attorney previous to that date, criminal, and to inflict a punishment for said action by depriving him of the right to practice in the courts; or, *Second*, to make the crimes therein mentioned of greater magnitude than they were when committed; or, *Third*, to change the punishment, and to inflict a greater punishment than the law annexed to the crime when committed; or, *Fourth* to alter the legal rules of evidence, so that less or different testimony than the law required at the time of the commission of the offense, might be received to convict the offender—unless, I say it was the intention of the legislature to do, by this act, and in fact did do some one or more of the four things above specified, then the act is not

an *ex post facto* law within the prohibition of the constitution.

The act in question is in the words following : " No attorney at law shall be allowed to practice in any court, or before any justice, or board of supervisors, of this State after the passage of this act, until he shall take in the court in which he proposes to practice, in addition to the oaths now required by law, the following oath :

" I, A. B. do solemnly swear that I have not since the 20th day of June, 1863, borne arms against the United States, nor against the State of West Virginia ; that I have voluntarily given no aid or comfort to persons engaged in armed hostility thereto by countenancing, counselling or encouraging them in the same ; that I have not sought, accepted, nor attempted to exercise the functions of any office whatever under any authority in hostility to the United States or the State of West Virginia ; that I have not yielded a voluntary support to any pretended government, authority, power or constitution within the United States, hostile or inimical thereto ; and that I take this obligation freely without any mental reservation or purpose of evasion."

I fail to see anything in this law that contemplates a *punishment* for any past act whatever, or for any of the things mentioned in the oath itself.

It declares no action to be criminal which was innocent when it was done.

It makes no crime greater than it was before the passage of the law.

It neither changes a punishment nor inflicts a greater one ; nor does it alter the rules of evidence in any respect, in order to convict an offender ; therefore, in no proper legal sense can the law be regarded as *ex post facto*, and for the same reasons it possesses none of the requisites necessary to constitute it a bill of pains and penalties.

While the statute, if sustained, may operate an inconvenience, and even a hardship to these applicants, and others similarly situated, it is nevertheless a *remedial* and not a *penal* statute. It is manifestly *retrospective* in some of its bearings,

for it relates to attorneys that were such previous to the date of its passage, and refers to actions done by them antecedent thereto.    Statutes are, *prima facie* prospective in their operations, and it ought never to be presumed that the legislature intended to enact retrospective laws when the words will admit of any other meaning.—(*Elliott's Ex's.* vs. *Lydell*, 3 Call 268.)

I think that by no fair interpretation can the words employed be made to have an exclusive prospective operation. The expression, "No attorney at law," has the same signification as *not any attorney at law*.   In other words the effect of this statute is, to require *every* attorney at law, regardless of his former rights and privileges, to take the oath therein prescribed,—if he did not take it he could not be allowed to practice.    A different construction would render the law totally ineffectual as a remedy for the evils which called it into existence.    These evils have already been adverted to. The evident intention of the law-maker was to guard the public against a class of persons who occupy a semi-official position, clothed with privileges not enjoyed by the private citizen.    For by the very nature of the relation of attorney and client, the latter is compelled to entrust the former with the most sacred interests, affecting property, character, and even life itself; having no assurance for the attorney's fidelity, other than his license to practice—which is a certificate by the court that its possessor is a person of moral and intellectual worth, and of that high character for honor and integrity that entitles him to the confidence of all needing professional aid.

The legislature has thought it dangerous to the welfare of society, to continue to the attorney his privileges as such, who, by voluntary complicity with the rebellion, is unable to take the oath prescribed by the act in question.    It is a statute—not to punish the attorney—but to protect society, and to keep free from reproach the profession of which he is a member.    This being then a *remedial* act is not unconstitutional because of its retrospective operation.—(*Com.* vs. *Hewett*, 2 H. & M. 181.)

Our next inquiries are, does this statute impair the obligation of a contract, and does it deprive a party of property without due process of law?

Neither of the applicants has been licensed in *this State* as an attorney, and there is no proof of either having been licensed in another State. Whatever may be our individual and unofficial knowledge that each has been a practicing attorney in the courts of Virginia, this knowledge is not proof —we cannot take judicial notice of the fact—and so far as any fact under the motion is required to invoke a construction of the constitutional merits of the statute, it must be proved.

It is the duty of the court, in a matter of such gravity to proceed with strictness. Although the Attorney General has confined himself to the discussion of the validity of the act of February 14th, 1866, I do not understand him as having conceded this proof except argumentatively. The applicants, therefore, severally stand as unlicensed, and, to be admitted to practice within this State, must comply with §1, or §2, of chapter 164, of the Code, page 699—as the case may be—in order to qualify themselves to be sworn; whether the proper oath be that prescribed in §3, same chapter, only, or this and the oath prescribed in the act of February 14th, 1866. Then if the court was to act strictly upon the proofs before it, with propriety it might be said there is nothing presented in this application which raises a construction of the last named act. But let us assme that each of the applicants has produced under his motion, a license duly issued to him in Virginia, to practice in her courts. The license is a license to practice in the courts of Virginia, and, by its necessary import, can of itself have no extra territorial operation.

As the territory of the State might from time to time be enlarged, or by the formation of new States be contracted, so the territory covered by a license would be expanded or contracted. A different construction would give to the license an operation broader than its terms, and enable the State of Virginia to impose upon any new State, thereafter formed

out of her territory, a legal profession against the policy of such new State ; as to which policy that State is supreme, except as limited by the federal constitution.

These applicants, then, stand here each upon his foreign license, as he would in the court of any other of the States, besides Virginia, where he might, according to the statutory practice, apply upon the basis of the license for admission to the bar of such other States. Under the code of this State, page 699, §2, the foreign license merely relieves him, upon the principle of international, or inter-State courtesy, from passing through, or complying with, §1, same page, but advances him no further.

In such case, he must then take, in order to consummate his membership, the attorney's oath, prior to February 14th, 1866, that was prescribed in §3, same page. By the act of February 14th, 1866, it is so far modified that the oath prescribed by the latter must be taken in addition. Therefore, these applicants, having as yet no license under this state, having at most but foreign licenses, which they may employ to obtain admission to the bar of this State, being at this point no farther advanced to that end, than if they based their application upon the certificate of character and attainment prescribed by said §1, p. 699 of the Code, and unable to practice, till they shall have taken the oath or oaths prescribed and in force at the time of their application, they stand, *not as attorneys, but as candidates for original admission as attorneys, and their admission will be complete only upon taking the several oaths now in force, and, therefore, that of the act in question, as well.*

Conceding that a license granted by this State, or its authority, vests a right as by contract; that admission to practice under a foreign license is equivalent to a license obtained within the State, and that, if they had severally received such licenses, or obtained admission, upon foreign ones before the passage of this act, and that the act would be invalid, as tending to disturb them, still, the applicants have no such licenses ; therefore, no vested rights to be disturbed.

*They stand as candidates whom the State will admit to her pro-*

*fessions, upon their complying with the conditions of membership existing at the time of their application—one of which conditions is, the acceptance of this oath.*

To present this case most strongly for the applicant under this head, that is, the assumption that each has produced a foreign license, an important element has been thus far laid aside. The 2d section of the Code (page 699) permitting the candidate to be admitted upon the proof of a foreign license, requires that this proof be accompanied with proof that he is—(using the present tense)—a *practicing* attorney under that license. The section cannot apply unless it applies as it is—each provision being allowed its appropriate effect. There is no proof, in either of the present cases, that the applicant is a *practicing* attorney in Virginia under his license. Hence, he is not in a condition—has not gone far enough to apply for the oath requisite to be taken, so as to give to him admission to this bar, whatever the oath may be. Therefore no fact yet appears under either application, calling for a construction of the statute of February 14, 1866, except, possibly, the application of Mr. Boggess.

Let it, however, be conceded, for the sake of the argument, that section 2d of the Code, page 699, permitting admission upon a foreign license, under which the licensee is "practicing" in the foreign State, has been fully complied with in the proof, and that each applicant stands as if before the passage of the act of February 14, 1866, he were a regularly licensed attorney within the State, how does the case then stand?

This is putting the case most strongly in favor of the applicant, and raises directly and fully the question as to the constitutional validity of the act.

The principle of the act is involved in the power, and flows from the duty of the State to perfect itself, that is, the welfare of the people. It proceeds upon the distinction between laws passed to punish for offences, in order to prevent their repetition, and laws passed to protect public offices, franchise, and privileges from abuse by falling into corrupt hands. The legislature may not pass laws in the form, or with the

effect, of Bills of Attainder—*ex post facto* laws—or laws impairing the obligation of contracts; it may, and is bound, to pass laws restrictive, and exclusive, for the preservation or promotion of common interests, as political or social emergencies may from time to time require; though such laws indirectly involve, in certain cases, disabilities.

The State is organized for the public as well as for individual good. While it may not violate the constitutional guards that are thrown around the latter, it may not neglect the demands of the former. All public grants are to be construed strictly. In the absence of words to the contrary, the State is not, in any grant, to be presumed to part with any of the power inherent in it, for the protection of the common welfare.

In respect to grants in the form of public office, of privileges in the nature of offices, or of any privileges, the exercise of which directly and necessarily bear upon the moral interests of the public, the legislature cannot part with this power, inherent and supreme in it, to preserve the general good, even if it would.

In this sense it may be said, that the power of the State, as to the last named grant, is inexhaustible. The case of the proprietors of the *Charles River Bridge* vs. *Warren Bridge, and others*, 11 Pet. 420, illustrates in part, but with great force, this distinction.

In the same view the other cases cited in the syllabus of this one may be referred to.

Let us now apply this distinction to the present motions, bear in mind that in each case cited upon the argument, the contract, the obligation of which the statute was held to impair, was a contract with individuals, or a grant as of a ferry, toll, or right of way for a specific purpose or time, and where the effect of the statute was a clear interference, interrupting or preventing the enjoyment of the contract or grant, before the latter had expired as to time, or its purpose had been accomplished : and no case of a different character has been brought to the attention of the court.

Whatever may be the status of an attorney, whether official or semi-official—or *"in some sense official"*—as was held by Judge Roane, in 1 Munroe, 482, Leigh's case; and by Judge Brown, in *ex parte*, Faulkner, 1 West Virginia Reports; or by the court in 22 California Report, his license is in the nature of a commission. It comes from public authority, and confers upon him powers and privileges, and subjects him to duties, which do not attach to him as a citizen, or as private proprietary interests or obligations. They are exclusive, special and large. They render him an arm or branch of the administration of justice, essential to and inseparable from it.

The profession, organized as it is in the civil, English and American systems of law, became of this necessity a recognized institution. The attorney's participation in the administration of justice is constant, his influence subtle and potent. The necessity under which the profession is organized and maintained, involves the further necessity of a continuous and unlimited control over it by the State; otherwise, a power or element in the administration of justice, always great, would become, at once, irresponsible. It would be singular, then, if the State has not retained over its legal profession this continuous control, especially in case of practitioners under foreign licenses. Chapter 164 of the Code, page 699, contains, aside from the act of February 14th, 1866, all the provisions for the admission of attorneys to its courts.

The attorney is purely a creature of the statute; and the Code contains no hint of any *tenure of attorneyship beyond one at will;* and upon the principle of the authorities above referred to, and upon what strikes me as an obvious and paramount rule of public policy, no other tenure can be implied. The act of the Colonial Assembly, in the year 1645, expelling all attorneys and forbidding them to practice, (I. Hen., Stat. 305,) assumed the power of the Colonial Government, to abolish the then existing attorneys of the Colony. From that time down to the first Revised Code, page 267, sections 1–14, adopted in 1819, the Colonial, and subsequently the

state legislature of Virginia was repeatedly legislating upon the subject of attorneys, and evidently upon the assumption that this continuous and unlimited control was vested in it.

The act of 1819 remained in force until the adoption of the Code in 1860, when its provisions above referred to were incorporated *verbatim* into the Code. (Chapter 164.)

The provisions contained in this chapter for regulating the conduct for attorneys, if to be regarded as restrictive of the authority to be used against them, are restrictions upon the authority of the *court alone*, not in anywise limiting *legislative authority* over the subject. Whether they are in fact restrictions, will be considered hereafter.

The license granted under the Commonwealth, and this State, have simply authorized the licensees to practice in the courts of the State, being silent as to the tenure of attorneyship, conforming in this to the statute, and conveying in this particular the same construction. The first general statute providing for appointment of attorneys, or (as I may say,) for the organization of the legal profession in England, is the 4th Henry IV, chapter 16, in the year 1402, (I Stat. at large, page 543,) authorizing the judge to appoint attorneys on proof of proper character and attainments, expressed in these words:

" Also for great damage and mischiefs which have ensued before this time, to divers persons of the realm, by the great numbers of attorneys not knowing nor learned in the law as they were wont to be before this time, it is ordained and established that all attorneys shall be examined by the justices, and by their directions their names be put in a roll, and such as be good and virtuous, and of good fame, shall be received and sworn well and truly to serve in their offices, * *. * and other attorneys shall be put out by the discretion of said justices; * * * and if any such attorney be hereafter notoriously found in default, of record or *otherwise*, he shall foreswear the court, and shall never after be received to make any suit in any court of the King;" the *act being silent as to tenure.*

Our Code (section 1, chapter 164, page 699,) is the same in its idea.   In this particular, the English remains in force, and the practice of the English courts, which I shall presently allude to, is evidently based upon this act.   If the license vests a right in the attorney to continue practice, it must impose a reciprocal duty to *remain* in practice.   If he may not, on the one hand, be stopped in his practice, at the will of the State, he may not, on the other hand, withdraw from it at his own will.   Yet, was it ever doubted that the attorney might leave practice, or withdraw from the profession at will ?   The courts of general jurisdiction, both in England and the United States, have exercised supervision over the attorney upon the universally assumed right to exclude or admit, on application for admission, or to dismiss, after admission, for misconduct or unfitness of character, treating the power to pass upon the original application, and the question of dismissal, as commensurate; the mode being, where the unfitness of the party as to character or conduct is questioned, to proceed summarily against him by rule to show cause, accompanied with a specification of charges; conferring on him the right to purge himself, on oath, and subjecting him to counterproof.   4 Bl. Com. 287, 1 Zabriskie, 346, *State* vs. *Eagle.*

In New Jersey, 1 Zabriskie, 346, *State* vs. *Eagle,* the usual qualification of character and attainments are required, the proof of them being by certificate, and in that case, the court held that it could go behind the certificate of character, as it may have been given upon misrepresentation, and ordered rule to issue accordingly.   It is clear that under section 1, chapter 164, of the Code, the judges might likewise go behind the certificate.   So that, in respect to the power to admit or exclude on original application, the power of our courts, under this section of the Code, is in accordance with the general practice.

Has the right to dismiss for misconduct, or loss of character, been restricted by the Code ?   Every presumption is the other way.   The only sections relating to the point are §§ 5 and 6.   Section 5 would seem to be confined to cases of

admission under §1, but whether so confined or not, evi-, dently authorizes the court to dismiss upon production of the record, (if in its keeping, or a duly certified copy of record, if the original lies elsewhere,) of conviction of the felony, and dispensing with proceeding by rule. Otherwise, this section of the statute is superfluous.

In this view, the section enlarges the power of the court in cases of felony—certainly does not restrict it. Section 6, in cases of malpractice, enlarges the power of the court by authorizing it, in its discretion, to submit the issue to a jury.

All other cases, besides those specified in §§ 5 and 6 as felonies, where there has been no conviction or misdemeanor, other than for malpractice, are left as at common law.

The court on suggestion that either of the applicants has been in complicity with the rebellion, might, under a rule, require him to purge himself on oath, whether an attorney or a candidate for attorneyship,—but subject to counterproof.

In view of the wide-spread influence of the rebellion, the court, upon probable ground of suspicion that he had been in complicity with it, might properly require every party asking for admission to the bar, or claiming to return to practice, after an absence from it during the war, to show cause under the usual rule.

Now the legislature may, under the Constitution, regulate the powers of the courts, diminish or enlarge them. Hence, in the exercise of its reserved authority, may do what courts in the exercise of their common law powers, as defined by their common law practice, or in the exercise of their statutory powers cannot do. Clearly it may do as much. It has done less, through the medium of a test oath, the act of February 14th, 1866, as a mere summary proceeding, to test the fitness of the party, without the formality of a rule to show cause,—giving to the party an opportunity to purge himself, *not subjecting him to counter-proof*, and prudently applying to all applicants to meet the exigency of the case.

The statute is not even retrospective, except in the sense

in which almost every remedial proceeding is retroactive, that is, applying a remedy against an existing or transpired mischief.   In other words, the legislature has only exercised a power co-extensive with the evil it has sought to remedy.

The proposition, so confidently and constantly advanced upon the argument, that the test oath can no more be applied to a lawyer, than it can be to a farmer or mechanic, is merely specious.   Whether such an oath would be applied to a farmer or mechanic, as a condition of continuing his vocation, we are not called upon to decide.

It is sufficient to say that their *right to labor in their vocation is founded, not upon a license but upon citizenship ; that the lawyer's is founded, not upon citizenship, but a license:* and that so peculiar as to leave the control of it continuously and supremely in the State.   I am clear that the act of February 14th, 1866, does not impair the obligation of contracts.

If the objection that the act February 14th, 1866, was a bill of attainder, or an act in the nature of a bill of pains and penalties, an *ex post facto* law, or a law compelling a party to be a witness against himself—or a law presuming guilt, instead of innocence—have at any time seemed to require a more formal notice, they are now, in my judgment, answered. It is sufficient to add, that the act neither seeks nor attempts a corruption of blood—has, therefore, not even the semblance of a bill of attainder.   That the definition of an *ex post facto* law is familiar, that every case cited is one wherein a prosecution was founded upon a law retroactively creating a crime, or changing the punishment or proof of it; and, between such a law and the present, there is no resemblance.

That the act in no sense makes the party a witness against himself;—if he refuses the oath, he does not testify :—if he accepts it, he is a witness *for* himself.   That it does not *presume* guilt in advance—it impliedly *charges* it.   The rule to show cause—every civil proceeding in tort,—every criminal proceeding, does the same.

The application of those parties who introduce in evidence, a certificate of special pardon, granted by the President of the United States, and reciting that it was granted for the

remission of Treason against the United States, by complicity in the late rebellion, presents a state of facts which compels me to the following conclusions, namely : the pardoning power of the President is confined to offences against the United States, as he represents that government alone. Nor does he attempt to go beyond this limit. The legislature of this State has not been blind to the *fact, extent* and *aim* of the rebellion ; its purpose was to destroy the Union, and subvert the government of this State. Whether the crime of the rebellion was compound treason against the general government, and each of the State governments, is a question not necessary to be here determined.

The certificate so produced is an admission that the party was guilty of the offences pardoned. These parties stand therefore as exempted from the penalties of treason by them committed against the United States ; and it is not necessary to say whether they are still amenable to *this State* for the *same* act so far as it was an offence against the laws of this State—because neither the oath in question, nor the consequent deprivation resulting to the party who is unable to take it, is in the nature of a *penalty* for any offence, whether pardoned or unpardoned, therefore the question is not affected by conceding that they are exempt from the *penalties* in *both* cases. Although pardon of the Executive may work a " complete oblivion of the past," so that the crime pardoned, by fiction of law *has no legal existence*, yet it is *historically* true, nevertheless, and the parties stand by their moral turpitude of the crime. They have not the " honest demeanor," required by the Code. (Sec. 1, chap. 164.)

This is conclusive of unfitness to practice in the courts of this State. The evidence is volunteered by the applicants, and in my judgment, there is no alternative but to exclude them.

The law on the point is clear. 2 Petersdorf, 525, *Frost's case;* 2 Petersdorf, 607, *Brownell's case*; 1 Chitty's criminal law, 811; Cowper, 820, 6 East, 126, 143 ; 4 Burrows, 2,109, *Berry's case;* 2 Smith, 205, *Southerton's case;* 1 Chitty's Re-

ports, 558; 1 Chitty's, 228, *Smith* vs. *Trumpee;* 6 Leigh, 624, *Fisher's case.*

This motion as is well known, was argued at the last term of this court, when it was insisted that similar motions were then pending before the Supreme Court of the United States, and that the opinion of the Supreme Judges, although not authoritatively announced, was in accordance with the principles contended for by the applicants in this case. In view of the importance of the question involved, and in hopes of deriving additional light from that decision, this case has been held under consideration since the last term. Since the foregoing opinion was prepared we have been furnished with a newspaper abstract of the decision rendered by the Supreme Court of the United States, as well as the opinion of its four dissenting Judges. After a careful examination of that decision as furnished, I am constrained to adhere to the opinion already advanced.

APPLICATION DENIED.

*Note by the Reporter.*

It is proper to add that several gentlemen applied for admission to the bar during the term of court at which this case was argued, in addition to those whose names are mentioned in the statement of the case, without being required to take the test oath which was under consideration ; many of whom averred their readiness and ability to take it, but denied the power in the legislature to prescribe additional oaths to attorneys who had been duly admitted in this State before the passage of the act. Among this number Messrs. D. Lamb and C. Boggess are placed by the President in his opinion, they having averred in argument their readiness and ability to take the oath prescribed, but denied its constitutionality as to themselves, having been admitted to the bar of the court before the passage of the act.

It is proper also to add the order of the argument. Messrs. Hunter, Summers and Miller made the opening arguments, and were followed by Attorney General Maxwell in reply. Messrs. Hunter and Boggess followed the Attorney General for the applicant, and B. F. Stanton replied, resisting the motion. C. J. Faulkner concluded for the applicants.